Mario GARRETTO, M.D., and Digestive Disease Consultants, S.C., Plaintiffs,

v.

ELITE ADVISORY SERVICES, INC., and Robert D. Tomlinson, Defendants.

No. 91 C 2732.

United States District Court, N.D. Illinois, E.D.

May 22, 1992.

Thomas James Frederick, Michael Joseph Stepek, Winston & Strawn, Chicago, Ill., Jeffery R. Brodek, DeMark, Kolbe & Brodek, Racine, Wis., for plaintiffs.

Lora Ellen Minichillo, Aaron E. Hoffman, Schwartz & Freeman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

Dr. Mario Garretto, M.D., and Digestive Disease Consultants, S.C., plaintiffs in this action, have brought suit under Wis.Stat. § 551.59(1)(a) to recover $100,000 they invested in Elite Properties, Ltd., ("Elite Properties").[1] Jurisdiction is founded upon

---

1. This case was originally assigned to the Hon. Nicholas J. Bua, and was reassigned to this

diversity of citizenship. Plaintiffs argue that defendants, Robert Tomlinson and Elite Advisory Services, Inc. ("Elite Advisory"), solicited them to purchase securities in Wisconsin without a license as required by Wisconsin law, and, therefore, plaintiffs are entitled to the return of their full investment as well as interest and attorneys' fees. Plaintiffs have moved for summary judgment. For the reasons discussed below, plaintiffs' motion is granted.

## II. FACTS

On May 7, 1991, plaintiffs filed a complaint asserting that they are entitled to return of their investment in Elite Properties, plus interest and attorneys' fees, due to the defendants' solicitation and sale of securities to plaintiffs in Wisconsin without a license as required by Wis.Stat. §§ 551.31(1) and 551.31(3).[2] Section 551.31(1) provides that "[i]t is unlawful for any person to transact business in [Wisconsin] as a broker-dealer or agent unless so licensed ..." by the state of Wisconsin. Similarly, Section 551.31(3) provides that "[i]t is unlawful for any person to transact business in [Wisconsin] as an investment adviser unless so licensed or licensed as a broker-dealer...." Wis.Stat. § 551.31(3). Section 551.59(1)(a) further provides:

> Any person who offers or sells a security in violation of s.... 551.31 ... is liable to the person purchasing the security from him or her. The person purchasing the security may sue ... to recover the con-

sideration paid for the security, together with interest at the legal rate under s. 8.04 from the date of payment, and reasonable attorney fees....

Wis.Stat. § 551.59(1)(a).[3]

Plaintiffs allege that on February 18, 1988, Elite Advisory contracted with Garretto to provide financial planning and advisory services. (*See* Complaint ¶ 6.)[4] Plaintiffs further allege that this contract, denominated as a Financial Planning Agreement, ultimately resulted in the solicitation and sale of securities by defendants to plaintiffs. (Complaint ¶¶ 8–15.) Because defendants were not licensed as broker-dealers or as investment advisers in Wisconsin, plaintiffs contend that they are entitled to the return of the moneys they invested.

Plaintiffs have now moved for summary judgment against defendants. Plaintiffs argue that because there are no genuine issues of material fact with respect to their investment with defendants, they are entitled to judgment as a matter of law based upon the facts presently before the Court. These facts are summarized below.

### A. *Undisputed Background Facts*

Plaintiffs and defendants agree that Garretto was a Wisconsin resident at all times material to this action. (Elite Answer ¶ 1; Tomlinson Answer ¶ 1); Defendants' Response to Plaintiffs' Statement of Facts ("Def. 12(n)" ¶ 1.)[5] The parties also agree

---

Court by lot in July, 1991, when Judge Bua resigned from the bench.

2. The complaint originally contained six causes of action. On July 23, 1991, Judge Bua granted plaintiffs' motion to dismiss all causes of action except their first cause of action and dismissed Counts Two through Six of the complaint without prejudice. Only Count One of the complaint remains before the Court at this juncture.

3. Section 138.04 states: "The rate of interest upon the loan or forbearance of any money, goods or things in action shall be $5 upon the $100 for one year and according to that rate for a greater or lesser sum or for a longer or shorter time...." Wis.Stat. § 138.04.

4. The complaint alleges that the contract was executed "on or about February 17, 1988," which is the date reflected on the Financial

Planning Agreement entered into by the parties and discussed below. (*See* Complaint ¶ 6 and Exhibit A; Def.Exhibit 7.) However, Garretto stated during his deposition that the agreement was entered into on February 18, 1988, and this is the date reflected in plaintiffs' statement of uncontested facts and which defendants have conceded is correct. (Def.Exhibit 2; Garretto Dep.Tr. at 73; *see* Def. 12(n) ¶ 12.)

5. Defendants assert that Garretto maintained addresses in both Illinois and Wisconsin, but do not specifically deny the allegation that he was a Wisconsin resident at all times material to the complaint. (*See* Elite Answer ¶ 1; Tomlinson Answer ¶ 1.) Defendants' failure to specifically deny this allegation must be treated as an admission under Fed.R.Civ.Proc. 8(d). In any case, as defendants' Rule 12(n) statement makes clear, the only real dispute between the parties

that Digestive Disease Consultants, S.C. ("Digestive") is a Wisconsin corporation with its principal place of business in Kenosha, Wisconsin. (Elite Answer ¶ 2; Tomlinson Answer ¶ 2; Def. 12(n) ¶ 2.) Garretto is a 50% shareholder in Digestive. (Elite Answer ¶ 3; Tomlinson Answer ¶ 3; Def. 12(n) ¶ 2.)

The parties further agree that Tomlinson is the president and sole shareholder of Elite Advisory, an Illinois corporation. (Def. 12(n) ¶ 7; see Elite Answer ¶ 5 and Tomlinson Answer ¶ 5.) The principal business of Elite Advisory is rendering financial services to the public, and, as Tomlinson testified at his deposition, acting as an "investment advisor providing counseling services and financial strategies to help fulfill [the] client's objectives." (Tomlinson Dep.Tr. at 23–24; Def. 12(n) ¶ 7; Elite Answer ¶ 5; Tomlinson Answer ¶ 5.)

B.   *Undisputed Facts Relating to Sale of Securities in Wisconsin*

The parties agree that Tomlinson and Garretto met in Illinois in 1986 to discuss whether Garretto was interested in using Tomlinson's financial planning services. (Def. 12(n) ¶ 4.)[6] Later, in January of 1988, Tomlinson and Garretto spoke by telephone. (Def. 12(n) ¶ 3; Plaintiffs' Exhibit 1.)[7] This conversation was confirmed by letter dated February 1, 1988. (Def. 12(n) ¶ 5; Plaintiffs' Exhibit 1.)

Tomlinson and Garretto met again on or about February 18, 1988 at Tomlinson's offices in Schaumburg, Illinois. (Def. 12(n) ¶ 8.) At this meeting, Tomlinson discussed

with Garretto various investment vehicles for Garretto's money. (Def. 12(n) ¶ 13.) The parties agree that during the meeting, Garretto executed both the Financial Planning Agreement with Elite Advisory[8] and a commitment letter which required a deposit of $50,000 for use in a real estate syndicate to be formed by Elite Financial Services, Inc. ("Elite Financial"). (Def. 12(n) ¶¶ 12, 14.)[9] At this time, Garretto paid the first $2,000 of a total of $4,000 due to Elite Advisory under the Financial Planning Agreement for its services. (Def. 12(n) ¶ 12.)

Pursuant to the Financial Planning Agreement, Elite Advisory agreed to "provide financial planning and other services ... to the Client for a period of one (1) year...." (Def. Exhibit 7, ¶ A.) Among the services which Elite Advisory agreed to provide was the preparation of "a financial plan (the "Plan") consisting of a written evaluation and analysis of the information provided by the Client *and recommendations* for a personalized financial program...." (Def. Exhibit 7, ¶ A(2)) (Emphasis supplied.) In return, Garretto agreed to pay Elite Advisory for the services provided. (*Id.* ¶ M and p. 5.) Both Tomlinson and Garretto signed this agreement. (*Id.* at 4, 5.)

Following the February 18, 1988 meeting, plaintiffs and defendants continued to communicate with each other regarding the investment opportunities open to Garretto. The parties agree that Garretto gave defendants two checks totalling $50,000; receipt of these checks was confirmed in a letter dated March 10, 1988 sent to Garret-

---

is whether or not Garretto told Tomlinson that he was a Wisconsin resident. (*See* Def. 12(n) ¶ 1.)

6.   Defendants expressly concede that a meeting took place. (Def. 12(n) ¶ 4.) They make no such concession as to the subject matter of the meeting; however, their failure to deny plaintiffs' assertions as to this point must be treated as an admission that the meeting did concern Garretto's interest in using Tomlinson's financial services. *See* Local General Rule 12(n); *Bell, Boyd & Lloyd v. Tapy,* 896 F.2d 1101, 1102 (7th Cir.1990).

7.   There is a dispute as to whether Tomlinson initiated the call. (*See* Def. 12(n) ¶ 3.)

8.   Again, according to Garretto's deposition testimony, although dated February 17, 1988, the Financial Planning Agreement was actually executed on February 18, 1988 during Garretto's meeting with Tomlinson. *See* n. 4, *supra.*

9.   Although the parties do not completely agree, apparently Garretto sent the deposit to Elite Advisory, which placed the money in an interest-bearing escrow account. (Def. 12(n) ¶ 14; Pl.Exhibit 5.) The money later was invested in Elite Properties, an entity created by Elite Financial. (Def. 12(n) ¶¶ 26, 27.)

to in Kenosha, Wisconsin. (Def. 12(n) ¶¶ 15, 16; Def. Exhibit 16.) [10] The parties also agree that there were numerous telephone calls between Tomlinson and Garretto in the months following the February 18 meeting for the purpose of completing Garretto's financial plan. (Def. 12(n) ¶ 18.) In addition, defendants sent at least thirteen

10. The parties disagree as to when exactly the $50,000 payment was made. Plaintiffs claim that after returning home from the February 18, 1988 meeting, Garretto sent the checks by certified mail from Kenosha to Tomlinson in Illinois. (Pl. 12(m) ¶ 15.) However, defendants claim that Garretto wrote the checks while he was in Chicago at the February 18 meeting. (Def. 12(n) ¶ 15.) In any event, the payment was confirmed by an Elite letter sent to Garretto dated March 10, 1988. (Def. 12(n) ¶ 16.) As is evident from the discussion below, the dispute as to the date and circumstances of the payment is immaterial.

11. Defendants agree that Tomlinson wrote these letters to Garretto, but claim that a dispute exists as to whether the letters were in fact sent to and received by Garretto in Wisconsin. Defendants fail, however, to cite any evidence suggesting that these letters may have been sent to an address other than the Kenosha address appearing on the letters themselves. It is well established that bald assertions that a factual dispute exists, without citation to evidence which supports that contention, is insufficient to preclude entry of summary judgment. Fed. R.Civ.P. 56(e). *See, e.g., United Association of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1265 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990). The most support defendants are able to muster from the record for their position is a series of excerpts from Tomlinson's deposition, in which he testified that he did not know where the letters to Garretto were sent. (*See* Tomlinson Dep.Tr. at 151, 156, 181–84, 186–90, 190–95, 218–20, 222–23.) Asserted ignorance of a fact asserted by the plaintiffs and supported by the documentary evidence does not suffice to bring that fact into dispute, however. *See Hendler v. Wohlstetter,* 411 F.Supp. 919, 922 (S.D.N.Y.1975). *See generally Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991).

It should be noted that a few of these thirteen letters, although written by Tomlinson, were sent on Elite Properties, rather than Elite Advisory, letterhead. The Court has considered the significance of this circumstance below in n. 20.

12. Normally, it would be inappropriate for the Court to rely upon a factual assertion raised and documented for the first time in the movants' reply memorandum, without at least affording the non-movants an opportunity to respond to

letters to Garretto at his Kenosha, Wisconsin address. (Pl. Exhibits 12, 14, 16, 17, 18, 19, 22, 23, 24, 25, 28; Def. 12(n) ¶ 19.) [11] Each of these letters was addressed to Garretto at his Kenosha residence, and Garretto confirms that he received them all at this address. (Pl.Reply Mem., Affidavit of Mario Garretto; ¶¶ 2, 3.) [12]

the new assertion. *See Black v. TIC Investment Corp.,* 900 F.2d 112, 116 (7th Cir.1990). Here, it might have been the more prudent course for plaintiffs to have submitted Garretto's affidavit confirming the receipt of the letters from defendants at his Kenosha residence together with their Rule 12(m) statement and their original summary judgment memorandum, rather than their reply memorandum. Even so, the Court discerns no prejudice to the defendants in considering Garretto's affidavit. Plaintiffs unequivocally asserted in their Rule 12(m) statement that defendants had sent the letters to Garretto at his home in Wisconsin. (Pl. 12(m) ¶ 19.) As noted above in n. 11, defendants acknowledged writing the letters, but claimed that there was a dispute as to whether the letters were actually sent to or received by Garretto in Wisconsin. (Def. 12(n) ¶ 19.) Yet, the only evidence defendants cited to support this contention was Tomlinson's deposition testimony disclaiming knowledge of the matter. (*Id.*) As the Court has already observed, Tomlinson's ignorance of where the letters were sent or received is not evidence which contradicts plaintiffs' assertion that the letters were sent to Garretto's Kenosha residence. *See* n. 11, *supra.* This is particularly true where the letters themselves, which plaintiffs cited in support of their 12(m) statement, bear Garretto's Wisconsin address. (*See* Pl. 12(m) ¶ 19, citing Pl.Exhibits 12, 14, 16, 17, 18, 19, 22, 23, 24, 25, 26, 28, 30.) Defendants did not quibble with the authenticity of the letters, nor did they cite any evidence which affirmatively suggested that they might have sent the correspondence to Garretto at an address other than the one reflected on each of the thirteen letters. In this context, the submission of Garretto's affidavit with plaintiffs' reply memorandum did not inject a new issue into the case, nor should it have caught defendants off guard. Given the evident significance of Garretto's Wisconsin residence and his receipt of correspondence there, this was a matter which should have been fully explored in discovery. Consequently, it is more than reasonable to assume that had there been any evidence supporting the notion that Garretto might not have received the correspondence in Wisconsin, defendants would (and plainly should) have cited it in their responsive memorandum despite the fact that Garretto's affidavit had not yet been submitted.

If defendants can demonstrate any significant disadvantage posed to them by the belated tender of the affidavit and the Court's reliance

Among the letters sent to Garretto at his home in Kenosha, Wisconsin was a letter dated May 3, 1988. The May 3rd letter was sent by Tomlinson on Elite Advisory letterhead and indicated that defendants planned on closing the first property acquisition by the real estate syndicate in which Garretto would be investing on May 13, 1988. (The letter reveals the property to be a Melrose Park, Illinois shopping center.) The letter stated:

> We are planning to close on this transaction, tentatively, May 13, 1988. If you have not already received a telephone call from me, I will be contacting you to discuss the financial demographics of this investment. I would like to review with you the logic of the acquisition and the mechanics that must be completed with you to effectively participate as an investor.
>
> Since we are anticipating the real estate closing on May 13, 1988, we will be sending you a confidential private placement memorandum along with a subscription agreement which you will need to sign and return to us. It is most likely that we will utilize an express delivery company.
>
> This entire process will need to be completed by no later than Thursday, May 12, 1988. Therefore, upon receipt of this letter, if there will be any reason we will not be able to locate you between now and May 12th, please contact us immediately and we will make special arrangements.

(Pl.Exhibit 7; Def.Exhibit 18; Def. 12(n) ¶ 21.)

In addition to these letters, Tomlinson sent another letter to Garretto dated May 10, 1988 which was prepared on Elite Advisory letterhead and which bore Garretto's Kenosha address. (Def.Exhibit 19; Def. 12(n) ¶ 22.) [13] The parties agree that this letter described the "concept" of Elite Properties, the real estate syndicate in which Garretto would be investing as a limited partner. (Def. 12(n) ¶ 23.) A Private Placement Memorandum, a Subscription Agreement, and a Deposit Authorization letter were enclosed with the letter. (Pl.Exhibit 8; Def.Exhibit 19; Def. 12(n) ¶¶ 23, 24.) The letter requested that Garretto initial and sign the Subscription Agreement in designated places, sign the Deposit Authorization Letter so as to allow defendants "to use the funds to acquire the shopping center," and return the signed and initialed documents to Elite Advisory. (Def. 12(n) ¶ 25; Pl.Exhibit 8; Def.Exhibit 19.) The parties agree that Garretto signed and returned these documents by overnight mail to Tomlinson on May 12, 1988. (Def. 12(n) ¶ 26.) By this series of letters and meetings, Garretto purchased a one-half unit limited partnership interest in Elite Properties for $50,000. (Def. 12(n) ¶ 27; Tomlinson Answer ¶ 14; Elite Advisory Answer ¶ 13.)

Following this initial investment in Elite Properties, the parties completed a second transaction on behalf of Digestive. The parties agree that in June of 1988, Garretto forwarded a check for $50,000 to defendants which was applied toward the purchase, in Digestive's name, of another one-half unit limited partnership interest in Elite Properties. (Def. 12(n) ¶¶ 28, 29;

---

upon it, they may of course seek reconsideration of this opinion within the constraints of Fed.R.Civ.P. 11. The Court would note, however, that in the time which has passed since this motion for summary judgment became fully briefed, defendants have not sought the opportunity for leave to respond to any matters addressed in Garretto's affidavit.

**13.** Although the May 10th letter bears Garretto's Kenosha address (*see* Pl.Ex. 8, Def.Ex. 19), Garretto's affidavit does not confirm that he in fact received the letter at that address (*see* Pl.Reply Mem., Affidavit of Mario Garretto ¶ 2). Accordingly, the Court will not consider this particular letter, standing alone, as evidence that defen-

dants transacted business in Wisconsin. Defendants do agree, however, that Tomlinson wrote the May 10th letter to Garretto. (Def. 12(n) ¶ 21.) Moreover, in view of the fact that the letter itself bears Garretto's Wisconsin address, and defendants have come forward with absolutely no evidence suggesting that this or any of the many other letters bearing the same address were actually sent elsewhere, the Court will consider the letter, *in the context of* the other correspondence, telephone calls, and transactions reflected in the record, as evidence of a course of conduct directed at a Wisconsin resident.

Elite Answer ¶ 15, Tomlinson Answer ¶ 15.) [14] At this time, Garretto also paid the balance of $2,000 due to Elite Advisory under the Financial Planning Agreement for services rendered. (Def. (12(n) ¶ 28.)

The parties agree that during the course of these transactions, defendants were not licensed as investment advisers or broker-dealers in the State of Wisconsin. (Def. (12(n) ¶ 30.) They also agree that in February of 1989, plaintiffs tendered their interests in Elite Properties and that defendants refused the tender. (Def. 12(n) ¶ 31.) [15]

## III. ANALYSIS

Federal Rule of Civil Procedure 56(c) requires summary judgment to be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Such is the case here.

▮ Wisconsin law imposes strict liability on individuals who solicit and sell securities as investment advisors or broker-dealers in Wisconsin without a license. The Wisconsin securities statute provides that "[i]t is unlawful for any person to transact business in [Wisconsin] as a broker-dealer or agent unless so licensed" by the state of Wisconsin. Wis.Stat. § 551.-31(1). Likewise, "[i]t is unlawful for any person to transact business in [Wisconsin] as an investment adviser unless so licensed or licensed as a broker-dealer" by the State of Wisconsin. Wis.Stat. § 551.31(3). To determine whether defendants have violated these provisions, the Court must confront three issues. First, the Court must examine the capacity in which defendants

dealt with plaintiffs. Second, the court must determine whether the transaction in this case falls within the definition of "transact[ing] business." Third, the Court must determine whether these activities occurred in Wisconsin within the meaning of Section 551.31.

The Court notes at the outset of this discussion that the parties have not cited, nor has the court discovered, any guiding case law from Wisconsin on the precise issues presented in this case. Nevertheless, the terms of the statute are so clear, and defendants' course of conduct so plainly within the scope of the statute, that liability is apparent based upon the undisputed facts presently before the Court.

### A. Capacity in which Defendants Conducted Business

▮ The first issue the Court must address is whether defendants acted as broker-dealers or investment advisers when dealing with plaintiffs. Defendants, in opposing the motion for summary judgment, argue that they were acting as issuers, who need not be licensed under Wisconsin law. Wisconsin law defines an issuer as "any person who issues or proposes to issue any security and any promoter who acts for an issuer to be formed." Wis.Stat. § 551.02(8). The issuer exception which defendants invoke, however, only applies to broker-dealers and not to investment advisers. Compare Wis.Stat. § 551.02(3)(b) with § 551.02(7). [16] Thus, if the defendants acted as investment advisers within the meaning of the statute, a license was required under Wisconsin law.

Following standard rules of statutory construction, the Court must first look to

---

**14.** There is some dispute as to whether this $50,000 was "paid to" Elite Advisory, but defendants agree that a check in this amount was used to purchase another one-half unit interest in Elite Properties. (Def. 12(n) ¶ 29.)

**15.** It would seem that plaintiffs sought to rescind their investments because the real estate market had softened and the value of their interests in Elite Properties had declined. (See Def.Mem. at 5.)

**16.** Section 551.02(7)(c) excludes from the definition of "investment advisors" broker-dealers, to the extent their investment advice is solely incidental to conducting their business as broker-dealers and they receive no special compensation for it. This exemption is not applicable here, as the record reveals both that defendants were engaged to develop a complete financial plan for plaintiffs (and thus to give more than incidental investment advice) and that defendants were paid for their advice under the Financial Planning Agreement.

the plain language of the statute and may look to outside sources only if the language is ambiguous. *Ardestani v. Immigration and Naturalization Service,* — U.S. —, 112 S.Ct. 515, 520, 116 L.Ed.2d 496 (1991); *Robert Hansen Trucking, Inc. v. Labor and Industry Review Commission,* 126 Wis.2d 323, 377 N.W.2d 151, 155 (1985); *Hillman v. Columbia County,* 164 Wis.2d 376, 474 N.W.2d 913, 917 (App.1991), *review granted,* 482 N.W.2d 105 (Wis.1992).

■ Wisconsin law defines an investment adviser as:

[A]ny person who, for compensation, engages in the business of advising others, either directly or through publications, writings, or electronic means, as to the value of securities or as to the advisability of investing in, or purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities.

Wis.Stat. § 551.02(7). Having in mind the ordinary meaning of the terms used by the Wisconsin legislature in defining "investment advisers" [17] (*see Ardestani,* 112 S.Ct. at 520; *State v. Temby,* 108 Wis.2d 521, 322 N.W.2d 522, 526 (App.1982)), the Court turns to the facts presented by the record and considers whether defendants' actions fall within this definition.

As set forth above, the financial relationship between Garretto and Tomlinson developed in 1988. On February 18, 1988, Garretto met with Tomlinson in Tomlinson's office in Schaumburg, Illinois. At this meeting, the two men executed the Financial Planning Agreement and Garretto paid defendants the first $2,000 of the $4,000 fee required under that agreement. (Def. 12(n) ¶ 12.) Later, after a series of followup phone calls and letters between the parties, Garretto and then Digestive

each invested $50,000 in Elite Properties through Tomlinson and Elite Advisory.[18]

The undisputed facts reveal that in this relationship, defendants held themselves out as advisers, developed an investment plan, guided plaintiffs through the investment process and received a fee for so doing. The Financial Planning Agreement executed by the parties specifically states that Elite Advisory will provide investment advice and recommendations for a "personalized financial program." (Def.Exhibit 7, ¶ A(2).) Tomlinson described the role of Elite Advisory Services as that of an "investment advisor providing counseling services and financial strategies to help fulfill [the] client's ... objectives." (Tomlinson Dep.Tr. at 23–24.) The letters which Tomlinson and Elite Advisory sent to Garretto confirm that they did not serve as mere functionaries with respect to plaintiffs' investments. Rather, defendants held themselves out as a source of guidance as to the appropriate vehicle for the funds that Garretto and Digestive wished to invest. *See, e.g.,* Pl.Ex. 18 (letter of Feb. 1, 1988) ("The purpose of the [February 18] meeting will be to explain our financial planning concept and to collect all of your relevant personal and financial data."); 6 (letter of Feb. 18, 1988) ("As soon as you can, please forward the balance of the information we will need to complete your financial plan."); 14 (letter of June 27, 1988) (discussing investment strategies and concluding "we are going to start writing to you regularly with this type of information to keep you informed and to share our concern about, not only your financial plan, but the impact of this information on your personal lives"); 17 (letter of October 21, 1988) ("Essentially, the purpose of this letter is to formalize a meeting date before the holidays and begin to get programs in place regarding the funding for the boys' education needs, review your portfolio, mutual funds, etc."); 19 (letter of November 3, 1988) ("In an

---

**17.** The parties have not suggested that any of the words used by the Wisconsin legislature to define an "investment adviser" should be attributed unique connotations which are distinct from their ordinary meaning.

**18.** It is unclear from the record how and why Elite Properties was selected as an investment for Garretto and Digestive. There is no question, however, that defendants solicited and implemented plaintiffs' investment in Elite Properties. *See* pages 801–802, *supra.*

ongoing attempt to better match your portfolio's characteristics with your individual 'investment personality', I have enclosed a questionnaire.... Your response to this questionnaire will be instrumental in ... providing you detailed investment recommendations in the future."); 18 (letter of December 2, 1988) ("It was a pleasure meeting you the other day and I look forward to implementing your Financial Objectives."); 22 (letter of December 6, 1988) (setting forth a "summary of our 1989 forecast for the next several quarters," a series of investment recommendations, and concluding "one of the objectives of our firm will be to currently analyze all client investment portfolios to be put in a state of readiness for our upcoming recommendations for 1989."); 24 (letter of Feb. 6, 1989) ("Bob [Tomlinson] would like to schedule an appointment to review accomplishments to date as well as future objectives."); and 26 (letter of May 18, 1989) ("Enclosed you will find an article dated Wednesday, May 17, 1989 of the *Wall Street Journal.* We thought this article would be of particular interest to you since Mutual Shares are some of the funds we have recommended for a portion of your portfolio."). Finally, the record makes clear that it was defendants who guided plaintiffs through their investment in Elite Properties. (*See* Pl.Exhibits 7, 8; Def. 12(n) ¶¶ 20–29.)

The parties do not cite, and the Court has been unable to discover, any case law applying Wisconsin's definition of "investment advisor." The only authorities cited by plaintiffs are several administrative rulings, one of which specifically states that the decision applies only to the facts presented and should not be considered the formal opinion of the Commission. While these rulings are certainly not binding on the Court, they reinforce the Court's conclusion that defendants were acting as investment advisors in their relationship with plaintiffs.

For example, *In re Investment Advisory Activities of Richard N. Van Eerden,* 1978 Wisc.Sec.Lexis 5 (Nov. 10, 1978),[19] indicates that a firm may be deemed to be giving investment advice within the meaning of the Wisconsin statute even when it makes only generalized investment recommendations. *Van Eerden* involved an individual who, like defendants in this case, developed investment plans for clients. Typically, in the course of preparing such a plan, Van Eerden would give a client only general advice about various categories of investments (*e.g.,* tax shelters); not until after the plan had been presented to the client and the client asked Van Eerden to implement it would he make any specific recommendations about particular investments. Even so, the Wisconsin Securities Commission opined that any general advice which Van Eerden might have given in the course of drawing up the investment plan constituted investment advice within the meaning of the state law:

> It is not necessary for the firm to give specific recommendations about securities before the definition applies. A firm falls within the definition if it gives, for compensation, general investment advice about the advisability of investing in, purchasing or selling securities even though a particular security is not named.

1978 Wisc.Sec.Lexis 5 at * 3. *See also In re Gaarder & Miller, Inc.,* 1979 Wisc.Sec.LEXIS 18 at * 3 (Jan. 8, 1979) ("In our view, the making of recommendations as to the appropriateness of investments in general categories of securities falls within the statutory definition of 'investment advisor' ").

As these administrative rulings reveal, defendants' conduct was more than sufficient to render them "investment advisors" for purposes of Section 551.02(7). Tomlinson and Elite Advisory not only provided general investment advice to plaintiffs, but, in the course of creating a financial plan for Garretto, they also specifically provided information about, and accepted plaintiffs' investment in, Elite Properties. *See* Pl. 12(m) ¶ 13, Def. 12(n) ¶ 13; Pl. 12(m) ¶¶ 21–

---

**19.** This administrative ruling specifically states "[o]ur view should not be considered the formal opinion of this office," 1978 Wis.Sec.Lexis 5 at

*1, and the Court, therefore, weighs it accordingly.

29, Def. 12(n) ¶ 21–29. *See also* Pl.Ex. 7 (letter of May 3, 1988) (describing Garretto's forthcoming real estate investment in Elite Properties); and 8 (letter of May 10, 1988) (describing concept of Elite Properties).[20]

## B. *Transacting Business as Investment Advisors*

■ The same rules of statutory interpretation apply as the Court considers the second issue: Whether defendants "transacted business" as investment advisers.

Wisconsin law provides that "[i]t is unlawful for any person to transact business in [Wisconsin] as an investment adviser unless so licensed or licensed as a broker-dealer." Wis.Stat. § 551.31(3). The term "transact business" is defined as follows:

(5) "Transact business" as used in ch. 551, Stats., includes:

.       .       .       .       .

(b) For purposes of s. 551.31(3), Stats., advising any person in this state through the United States mail, by telephone or by other means from outside or from within this state as to the value of securities, the advisability of investing in, purchasing or selling securities, or issuing analyses or reports concerning securities to any person in this state through the United States mail, by telephone or by other means; and

(c) For purposes of s. 551.31(1) and (3), Stats., soliciting any person in this state through the United States mail, by telephone or by other means from outside or from within this state to become a customer, client or subscriber of the person on whose behalf the soliciting is performed.

21 Wis.Admin.Code, § SEC 1.02(5), 3 Blue Sky L.Rep. (CCH) ¶ 64,502, at 56,501 (1990). This broad definition covers the defendants' activity here.

As described by the summary of undisputed facts, defendants clearly transacted business as investment advisors with plaintiffs. After executing the Financial Planning Agreement, there were numerous phone calls and letters exchanged between Tomlinson and Garretto for the purpose of completing Garretto's financial plan. (Def. 12(n) ¶ 18.) Moreover, as the Court has noted above, included among these communications were letters specifically advising Garretto as to the investment in Elite Properties and requesting him to return various materials in order to effectuate that investment. *See* Pl. 12(m) ¶ 13, Def. 12(n) ¶ 13; Pl. 12(m) ¶¶ 21–29, Def. 12(n) ¶ 21–29; Pl.Exhibits 7, 8.

These calls and letters, being integral to plaintiffs' investments in Elite Properties, fall readily within the broad definition of "transact[ing] business" as that term is used in Section 551.31(3) and defined in the Wisconsin Administrative Code. Geared as they were toward development of a financial plan for plaintiffs and toward finalizing the purchase of limited partnership interests in Elite Properties, these calls and letters may be characterized both as communications advising plaintiff about investing in a particular security and as communications soliciting plaintiffs to become clients of Tomlinson and Elite Advisory. *Cf. In re Maas*, 1981 Wisc.Sec.LEXIS 69 at * 1, ¶¶ 2, 3 (June 12, 1981) (consent order) (suggesting that advising at least one per-

---

**20.** After Garretto had invested in Elite Properties, Tomlinson wrote a number of letters to him on Elite Properties letterhead describing the status of Elite Properties' real estate investments. *See* Pl.Ex. 16 (letter of July 27, 1988); 23 (letter of January 25, 1989), 25 (letter of March 28, 1989), and 28 (letter of May 8, 1990). Although Tomlinson wrote these letters, and although defendants have pointed to no evidence other than the difference in names which distinguishes Elite Properties from Elite Advisory, defendants might argue that such correspondence was really on behalf of the issuer of the securities which plaintiffs had purchased as op-

posed to an investment adviser. Arguably, therefore, such letters should not be considered as evidence that either Tomlinson or Elite Advisory transacted business as investment advisors. Even if defendants are given the benefit of this argument, however, the correspondence from Tomlinson and Elite Advisory regarding Elite Properties which preceded plaintiffs' investment (*see* Pl.Ex. 7, 8) and the later correspondence which addressed Garretto's general investment goals and additional investment options (*e.g.*, Pl.Ex. 12, 17, 18, 19, 22, 24, and 26) confirm that defendants were indeed acting as investment advisors.

son in Wisconsin is sufficient to constitute transacting business).

## C. *Conduct in Wisconsin*

■ Finally, the Court must determine whether defendants' activities as investment advisors amounted to conduct which took place in Wisconsin for purposes of Section 551.31(3).

The record reveals that a significant portion of defendants' conduct did take place in Wisconsin. Although all of the meetings between Garretto and Tomlinson appear to have taken place in Illinois, much of the exchange of information necessary in order to prepare a financial plan for Garretto and to execute plaintiffs' investment in Elite Properties took place via telephone calls and letters to and from Garretto in Wisconsin. Thus, for example, Tomlinson's letters of May 3 and May 10, 1988, described the pending real estate acquisition by Elite Properties and enclosed, for Garretto's execution and return, documentation such as the Subscription Agreement and Deposit Authorization letter which was necessary in order to implement Garretto's investment in Elite Properties, in addition to the Private Placement Memorandum which outlined the framework of Elite Properties. These letters, together with the other correspondence and phone calls directed to Garretto at his Kenosha residence, reflect a course of conduct through which defendants, to borrow a phrase commonly used in personal jurisdiction analysis, "purposefully established" and maintained contact with Wisconsin residents and procured their purchase of securities. *See Asahi Metal Industry Co. v. Superior Court of California, Solano County,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 1030, 94 L.Ed.2d 92 (1987). In this context, the fact that the meetings between Tomlinson and Garretto took place outside of Wisconsin is irrelevant, for neither Section 551.31(3) nor the administrative definition of "transact[ing] business" requires that all or even most of the business between the parties have taken place within the borders of Wisconsin. *See Hardtke v. Love Tree Corp.,* 386 F.Supp. 1085, 1091 (E.D.Wis.1975) (where defendants had conducted preliminary negotiations with plaintiff in Wisconsin for the sale of stock and certificate of stock was mailed to plaintiff in Wisconsin, defendants had offered or sold unregistered securities within scope of Wisconsin securities statute despite the fact that the plaintiff paid defendants for the stock in Iowa; "the fact that a portion of the transaction may have occurred in some other state is not controlling"). *See also Feitler v. Midas Associates,* 418 F.Supp. 735, 739 (E.D.Wis.1976) (where defendants had given plaintiff an unexecuted limited partnership agreement at meeting in New York, plaintiff had completed his portion of the agreement in Wisconsin and returned it to defendants in New York, and defendants had then completed their portion of the agreement and sent plaintiff a letter informing him that the agreement had been executed, there was both an offer to purchase a security from a Wisconsin resident and an acceptance directed to a Wisconsin resident which brought the transaction within the scope of the Wisconsin securities statute).

■ Defendants spend much of their brief arguing that they did not know that Garretto was a Wisconsin resident, and were not aware that they were sending letters to Garretto's residence. (Def.Mem. at 11–12; Def. 12(n) ¶ 1.) [21] However, the terms of Sections 551.31(1) and 551.31(3) impose strict liability on those who violate them. The statute is not phrased as to incorporate a requirement of knowledge or intent. *Compare* Wis.Stat. § 551.58 (imposing criminal liability, *inter alia,* for

---

**21.** Indeed, defendants make the assertion that Garretto told Tomlinson that he was an Illinois resident. (Def. 12(n) ¶ 1.) In support of this claim, defendants cite pages 70 and 71 of the transcript of Tomlinson's deposition. (*See id.*) A review of those pages, however, reveals that Tomlinson did not say as much. What Tomlinson actually said was that it was his "understanding" that Garretto was an Illinois resident. (*See* Tomlinson Dep.Tr. at 71, 75.) Later, after repeated questions on the subject, Tomlinson did say that Garretto had told him he lived in Illinois (*id.* at 77), but there was no apparent followup which harmonized this with his earlier answers (*compare id.* at 75–76 with *id.* at 77).

false or misleading statements when person making them knew or had reason to know they were false or misleading). Therefore, the defendants' subjective belief as to where Garretto resided is simply not relevant. Because defendants admit that both Garretto and Digestive were Wisconsin residents at all times material to the complaint (*see* pp. 798–99 & n. 5, *supra*), and the record reflects a sustained course of activity directed to plaintiffs in Wisconsin, there is no genuine issue of material fact as to whether defendants were transacting business in Wisconsin.

In a closely related context, Wisconsin courts have twice rejected the contention that an intent requirement should be read into a portion of the Wisconsin securities statute which imposes criminal liability upon those who willfully engage in conduct which operates as a fraud or deceit upon a person. In *Van Duyse v. Israel,* 486 F.Supp. 1382 (E.D.Wis.1980), a habeas proceeding challenging the defendant's conviction under this provision, the district court explained:

> [T]he plain meaning of the statutory provisions indicate that the State need only prove that the accused willfully engaged in conduct which operates or would operate as a fraud or deceit upon any person. It is the nature of the act which is dispositive, *not the state of mind of the actor.* In this sense, the statute imposes a form of strict liability. Once the seller has willfully engaged in conduct which operates or would operate as a fraud or deceit, he will not be heard to argue that he did not intend the consequences of his acts.

*Accord People v. Mitchell,* 175 Mich.App. 83, 437 N.W.2d 304, 308 (1989). In *State v. Temby, supra,* 108 Wis.2d 521, 322 N.W.2d at 526, the Wisconsin appellate court likewise held that the absence of the word "intent" from the statute signaled that intent was not an element of the offense. These cases lend strong support to the Court's conclusion that the absence of the word "knowingly" from Sections 551.31(1) and 551.31(3) obviates any requirement that a broker-dealer or investment advisor realize he is dealing with a Wisconsin resident.[22]

Moreover, defendants' arguments as to their purported ignorance are completely unsupported by the evidence. Defendants sent letter after letter to Garretto in Kenosha, Wisconsin in the months surrounding the transactions. Moreover, Garretto listed his Wisconsin address and phone number on the attachment to the "Subscription Agreement" he signed in connection with the investments in Elite Properties (*see* Def.Exhibit 21 at 9; Def.Exhibit 27 at 9).[23] Indeed, defendants themselves, under the heading "Residence Address/Telephone," listed Garretto's Kenosha, Wisconsin residence and telephone number (and no Illinois address or number) on the June 3, 1988 "Personal Financial Planning Case Analysis" which they prepared for Garretto. (Pl.Ex. 13 at 3.)[24] That defendants were dealing with a Wisconsin resident and a Wisconsin corporation was, at minimum, something they should have realized; and the evidence presently before the Court strongly sug-

---

**22.** The fact that the remedy for violation of Section 551.31 is merely rescission (*see* Section 551.59(1)(a)) disposes of any argument that the imposition of liability is inequitable absent proof of knowledge.

**23.** Garretto signed a separate Subscription Agreement for each of the two purchases. Garretto failed to list any address on the initial agreement that he completed in May, 1988 in connection with the first investment, but he did list his Wisconsin home and workplace telephone numbers (and no Illinois numbers). (*See* Def.Exhibit 21 at 9.) On the agreement Garretto signed in June, 1988 in connection with the

second purchase, he listed not only the Wisconsin telephone numbers but his home address in Wisconsin as well. (*See* Def.Exhibit 27 at 9.)

**24.** Garretto's residential address was different from his business address. (*See* Pl.Ex. 13 at 3 ("Personal Family Statistics".)) Notably, it is Garretto's residential address which consistently appears on the correspondence directed to him by defendants. (*See* Pl.Ex. 1, 6, 7, 12, 14, 16, 17, 18, 19, 22, 23, 24, 25, 28.) This rules out the possibility that defendants could have remained ignorant of Garretto's residence in Wisconsin by directing all correspondence to his business address.

gests that they were in fact aware of this circumstance.[25]

### D. *Remedy*

■ The penalty for violating the license requirement is clear. Anyone who offers or sells a security in violation of Section 551.31 is liable to the purchaser for "the consideration paid for the security, together with interest at the legal rate under Section 138.04 from the date of payment, and reasonable attorney fees...." Wis. Stat. § 551.59(1)(a). Plaintiffs are therefore entitled to recover the total of $100,-000 they paid for the partnership interests they purchased in Elite Properties. In addition, an award of attorneys' fees is mandatory, as the court held in *Criticare Systems, Inc. v. Sentek, Inc.,* 159 Wis.2d 639, 465 N.W.2d 216, 221 (App.1990), *review denied,* 471 N.W.2d 509 (Wis.1991):

> The intent of the statute was to provide for enforcement of state securities laws largely by civil suits brought by citizens. 3 Loss, *Securities Regulation,* 1631, 1643 (1961). Inadequate budgets and uneven enforcement of Blue Sky laws make civil liability the only really effective sanction. *Id.* at 1631. We conclude that the award of reasonable attorney's fees encourages private enforcement of ch. 551, Stats. If a securities violation is found to exist, attorney's fees therefore are mandated.

The court went on to hold that the same was true for interest. 465 N.W.2d at 221. Accordingly, plaintiffs are also entitled to recover interest from the dates upon which the partnership interests in Elite Properties were purchased, together with reasonable attorneys fees.

No calculation of these amounts has been submitted to the Court. Plaintiffs shall file a statement of the amounts for which they seek recovery, including accrued interest and attorneys' fees, no later than May 29, 1992. Any request for attorneys' fees shall provide reasonable detail and supporting affidavits from plaintiffs' counsel as to the work performed. Defendants shall file any objections to the amounts sought no later than June 5, 1992.

### IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is granted, the Court finding that defendants transacted business as investment advisors in Wisconsin without a license. Entry of final judgment is held in abeyance pending the submission and review of a statement of the amounts plaintiffs are owed in principle, interest, and reasonable attorneys' fees.

---

**25.** Indeed, there really is no dispute as to defendants' knowledge that Digestive is (and was) a Wisconsin business. Tomlinson himself admitted in his deposition that he understood Garretto's medical practice was located in Wisconsin. (*See* Tomlinson Dep.Tr. at 75–76.) Moreover, defendants' only response to plaintiffs' assertion that Digestive is a Wisconsin corporation is that "[t]here is no evidence that Digestive's *only* office is in Kenosha." (Def. 12(n) ¶ 2.) This feeble rejoinder does not suffice to establish a genuine dispute of fact.