Arthur OATES, Plaintiff–Appellant,

v.

DISCOVERY ZONE, a Delaware
Corporation, Defendant–
Appellee.

No. 96–1205.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1997.

Decided June 23, 1997.

H. Candace Gorman (argued), Chicago, IL,
for Plaintiff-Appellant.

John P. Morrison (argued), Joanne L. Hy-
man, Bell, Boyd & Lloyd, Chicago, IL, for
Defendant-Appellee.

Gwendolyn Young Reams, Equal Employ-
ment Opportunity Commission, Washington,

DC, Carolyn L. Wheeler, Paula R. Bruner (argued), C. Gregory Stewart, Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, for Equal Employment Opportunity Commission, Amicus Curiae.

Before POSNER, Chief Judge, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

Arthur Oates, an African–American, filed suit against his former employer, Discovery Zone, alleging that his discharge from the position of Technical Support Representative at Discovery Zone was racially motivated and thus violated the Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e *et seq.* and the Civil Rights Act of 1871, 42 U.S.C. § 1981, as well as constituted an intentional infliction of emotional distress. The district court granted summary judgment in favor of Discovery Zone. We affirm.

## I. BACKGROUND

### A. *Factual Background*

Discovery Zone is a Delaware corporation which provides entertainment services to children in the form of indoor playgrounds, much like those commonly found in and around fast-food restaurants. The recreation facilities themselves are called Discovery Zone FunCenter stores. From September 1993 to April 22, 1994, Discovery Zone employed Arthur Oates, an African–American, as a Technical Support Representative. In that capacity, Oates was responsible for providing telephonic and personal support, including employee training, to FunCenter stores for their computer systems. While it is unclear from the record whether Oates' primary responsibility was limited to supporting the FunCenter stores' automated cash register systems or involved "support[ing] [the FunCenter stores'] computer systems, the AS/400s, [and] the PCs" on a

broader scale,[1] the distinction is largely irrelevant for purposes of addressing this dispute. In either event, Oates' position as a Technical Support Representative required him to remedy FunCenter stores' emergency computer-related problems. During his entire tenure at Discovery Zone, Oates reported directly to Bonnie Christenson who, in turn, was under the supervision of Paul Nance prior to April 8, 1994, and Mark McDermott after that date. Both Oates and Christenson worked in Discovery Zone's Rosemont, Illinois, support center; McDermott worked at Discovery Zone's corporate offices located in Chicago.

In early 1994, the Rosemont support center was understaffed, and as a result thereof, often a single employee was called upon to handle all calls from FunCenter customers. For example, one Technical Support Representative was typically scheduled to work from 7:00 a.m. until 9:00 a.m., and therefore, if he or she were absent and a replacement could not readily be found, customers' calls went unanswered during those hours. For obvious reasons, unanticipated employee absenteeism generated significant problems in Discovery Zone's efforts to provide FunCenter stores with effective computer systems support. Indeed, were a FunCenter store to require emergency assistance with respect to its computer system, whether it be an automated cash register or personal computer, and no Technical Support Representative was available to immediately remedy the problem, important accounting information, including inventory tracking data and sales figures, might very well be lost.

The record reflects that throughout his seven-month employment period at Discovery Zone, Oates was chronically absent from work. As a result, on January 14, 1994, Christenson formally "wrote up" Oates in an inter-office memorandum which, among other things, set forth in detail Discovery Zone's procedures for reporting employee absenteeism.[2] Oates received, signed, and admittedly

---

1. Discovery Zone explained at oral argument that Oates' primary responsibility was the former of the two, whereas Oates' deposition testimony suggests the latter.

2. Christenson had previously distributed two or three different memoranda, as well as given mul-

tiple verbal instructions, to every Technical Support Representative regarding Discovery Zone's absenteeism reporting procedures. Unlike her January 14, 1994, "write up" of Oates, these other correspondences were not performance

understood the memorandum. It read, in relevant part:

> We need to both put in writing, and discuss, each of the following issues that have happened in the past 2 months. These kinds of situations cannot continue in the future.... If these or any other issues to these issues continue to occur, further action will be taken against you.
>
> * * *
>
> 2. Numerous sick days were incurred in the past 2 weeks. A doctors note was procured for the last group of sick days off, and a doctors note must be procured from this day forward, for any further sick days off. Because of one of your sick days, the customer support hot line went unanswered for 3 hours, from 7am to 10am last week.
>
> 3. The proper procedures have not been followed regarding days off.
>
> I will reiterate these procedures:
>
> A. You must try to get another rep to take your shift for you.
>
> B. If, after exhausting all possibilities, you must call me at home and or page me, until you reach me.
>
> HM # [Christenson's home phone number]
>
> PAGER # [Christenson's pager number]
>
> * * *

Thus, if Oates wished to absent himself from a day of work, for whatever reason, he was required to attempt to find a Technical Support Representative replacement for his shift. Should Oates be unable to do so "after exhausting all possibilities," it was incumbent upon him to either call Christenson at home and/or page her until she was contacted.[3] If Oates failed to follow these procedures when taking off from his work assignment, "further action" would be taken against him. Between January 14, 1994 and April 21, 1994,

Oates was absent from work on at least eight other occasions for various reasons.

On or about February 28, 1994, McDermott commenced work for Discovery Zone as its Manager of Corporate Information Services. In early April 1994, he assumed the responsibility of overseeing the Rosemont support center from his Chicago-based office, which included direct authority over Christenson, and through her, indirect responsibility over Oates and other Technical Support Representatives. Shortly thereafter, McDermott met with Christenson to discuss her personnel. During this meeting, Christenson mentioned that she and McDermott's predecessor, Nance, were "on the path" to discharging Oates. On April 14, 1994, McDermott warned Oates over lunch that his poor attendance record and possible termination had been discussed in a conversation between himself and Christenson.

On April 21, 1994, a day upon which Oates was the sole scheduled Technical Support Representative in Discovery Zone's Rosemont office, he was again absent from work. At 7:01 a.m., one minute after his shift was to begin, Oates left a voice-mail message for Christenson on her *office* telephone regarding his absence. Because Christenson was not scheduled to arrive in the office until a later hour and apparently had not checked her messages at work, McDermott was the first manager to learn that no Technical Support Representative was on duty upon receiving an "early morning" call from a disgruntled FunCenter customer who was unable to reach the Rosemont support center. When McDermott was also unsuccessful in contacting the Rosemont support center, he paged Christenson at approximately 8:30 a.m. to ascertain why it was unmanned. Christenson, who was en route to work, immediately contacted McDermott via her car phone and explained that Oates was scheduled to work the morning shift, and that she had no knowledge as to why he was not fielding customers' calls. Several hours later, Chris-

---

reprimands, but rather were provided for general informational purposes.

**3.** Christenson typically was not in the Rosemont office during those hours in which only one Technical Support Representative was scheduled to work (i.e., nights, weekends, and early morn-

ings). Because Christenson personally "filled in" whenever an employee reported absent and the Support Center would have otherwise gone unmanned, it was essential that she either be contacted at home or paged.

tenson confirmed for McDermott that Oates had failed to report for work that morning and, furthermore, he also failed to follow the proper procedure for absenting himself from his work assignment. Meanwhile, the Rosemont support center went unmanned for at least two hours. McDermott *decided* to terminate Oates that very day for his failure to follow Discovery Zone's absentee notification procedures—the same procedures summarized in Christenson's January 14, 1994, memorandum. That is, Oates neither found a replacement Technical Support Representative to cover his scheduled shift, nor did he call Christenson *at home* or page her until she was reached. With the approval of Discovery Zone's Vice President of Human Resources, both McDermott and Christenson met with Oates in Christenson's office on April 22 to jointly *inform* him of his discharge.

In early April 1994, prior to the incident detailed above, Christenson posted at the Rosemont office a single copy of a one-page magazine advertisement which pictured four monkeys. One of Oates' co-workers, believing that the "monkey picture" was representative of their "department *as a whole,*" subsequently made approximately five duplicates of the advertisement and hung them in the office as well. Allegedly at some point prior to April 18, 1994, Oates' first name, "Art," was written above one of the monkeys depicted in one of the pictures.[4] As the only African–American working at Discovery Zone's Rosemont office, Oates was offended by the display and immediately brought the situation to Christenson's attention. When Oates purportedly requested that Christenson remove the picture, she failed to comply with his wishes, and told Oates that he was being "over-sensitive."[5] Oates never complained to any other of his superiors, including McDermott, about the picture before his

April 21, 1994 termination. Although Oates claims to have sent Mary Mierkiewicz, Discovery Zone's Human Resources Manager, a memorandum complaining about the posted advertisement prior to April 21, it was both dated and received April 25, 1994—four days *after* Oates' discharge.

### B. *Procedural Background*

After exhausting his administrative remedies via the Equal Employment Opportunity Commission ("EEOC"), as required pursuant to 42 U.S.C. § 2000e–5(e)(1), Oates filed suit in the District Court for the Northern District of Illinois on November 18, 1994, alleging that: (1) Discovery Zone terminated him because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2 *et seq.* and the Civil Rights Act of 1871, 42 U.S.C. § 1981; (2) that Discovery Zone retaliated against him for complaining about race discrimination, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–3(a); and (3) that Discovery Zone intentionally inflicted "emotional distress" upon him as that term is defined under Illinois law. Oates never submitted a claim for racial harassment before either the EEOC or the district court. Approximately one year after filing his complaint, Discovery Zone filed a motion for summary judgment. On January 5, 1996, the district judge, upon finding that "no question of material fact exist[ed] with respect to plaintiff's claims," *Oates v. Discovery Zone, Inc.,* No. 94 C 6934 (N.D.Ill. January 5, 1996), granted the defendant Discovery Zone's motion and dismissed the case in its entirety.

### II. ISSUES

The ultimate question presented in this appeal is whether the district court's grant of summary judgment in favor of Discovery

---

4. Oates does not claim that he has any knowledge as to the identity of the person who wrote his name on the "monkey picture." However, the district court noted in its decision that Discovery Zone offered the written opinions of two independent handwriting experts who, after comparing writing samples from Oates, Christenson, and other employees, determined that Oates himself scribed his name on the advertisement. Moreover, one of Oates' co-workers, Joseph

Wood, made a sworn statement to the effect that Oates appeared at the Rosemont office *after* his termination and wrote "Art" on the picture.

5. In its Rule 12(m) response to Oates' statement of undisputed facts, Discovery Zone averred that Oates neither complained to Christenson about, nor asked her to remove, the "monkey picture" allegedly bearing his name.

Zone was proper. Specifically, Oates asks us to consider whether the district court: (1) erroneously relied upon disputed facts in granting Discovery Zone's motion for summary judgment; (2) applied an incorrect standard in granting Discovery Zone summary judgment; and/or (3) improperly awarded summary judgment with respect to his claims for racial harassment, retaliatory discharge, and intentional infliction of emotional distress.

## III. DISCUSSION

We review the district court's decision to grant summary judgment *de novo*, accepting all facts and inferences in a light most favorable to Oates as the non-moving party. *Vukadinovich v. Board of Sch. Trustees*, 978 F.2d 403, 408 (7th Cir.1992), *cert. denied*, 510 U.S. 844, 114 S.Ct. 133, 126 L.Ed.2d 97 (1993). Summary judgment itself is appropriate whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986)). Of course, a non-moving party may not avert summary judgment by baldly contesting his adversary's factual allegations. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968) (Plaintiff cannot rest on his allegations to get to a jury without "any significant probative evidence tending to support the complaint."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (A non-moving party must do more than simply "show that there is some metaphysical doubt as to the material facts."). Rather, Local Rule 12(n) requires that the opponent to a Rule 56 summary judgment motion "file ... a concise response to the movant's statement, ... including, in

the case of disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." It is with these principles in mind that we proceed in addressing Oates' appeal.

### A. District Court's Reliance on Allegedly Disputed Facts

Initially, Oates asserts that the district court improperly considered material facts which were "expressly contested by Plaintiff" when it granted Discovery Zone's motion for summary judgment, and as such, reversible error is manifest. We shall consider below each fact upon which Oates contends the district court erroneously relied, construing all evidence and inferences in a light most favorable to Oates as the non-moving party. *See Vukadinovich*, 978 F.2d at 408.

### 1. Oates Never Complained to Any Other Superior Until After He Was Terminated

Oates first argues that he disputed the district court's conclusion that "Plaintiff did not complain to any superior until close to the time he was terminated." At the outset, Oates has misquoted the district court's ruling, which stated, "Plaintiff did not complain to any *other* superior about the picture until close to the time of his termination." Thus, the district court gave Oates, as the non-moving party, the factual benefit-of-the-doubt and assumed that Christenson was notified of his discontent over the "monkey picture" on April 18, 1994. The district court also understood the undisputed evidence to be that Mierkiewicz opened and received Oates' letter which was both dated and received on April 25, 1994. In short, the district court, having construed all facts and related inferences in favor of Oates, found that he had not complained to anyone other than Christenson *before* being discharged. And to the extent that Oates' post-employment complaint is irrelevant vis-a-vis the issues before us today (i.e., retaliatory discharge), we consider his April 25 correspondence to be largely ineffectual.

### 2. Oates Offered No Evidence that Christenson Was Responsible for or Persuaded McDermott to Bring About His Termination

The district court also found that, "With respect to events subsequent to April 18, Plaintiff has offered no evidence that Christenson was responsible for or persuaded McDermott to bring about his termination." On appeal, Oates contends that this determination was improper because, as he states, Christenson actually testified that she fired the Plaintiff; that Oates had alleged that McDermott and Christenson admitted to having conversations regarding his performance during the week preceding April 21, 1994; that Christenson and McDermott consistently used the term "we" to describe the decision to terminate Oates; and that McDermott admitted that his decision to discharge Oates was based, in part, on information supplied by Christenson.

Once again, we do not believe that the district court was in error. The record is unequivocal in evidencing that it was McDermott's *decision*, and his alone, to terminate Oates. McDermott and Christenson did admittedly have conversations regarding Oates' continued employment with Discovery Zone during the week preceding April 21, 1994, but these discussions did not address Oates' performance. Moreover, neither Christenson nor McDermott used the term "we" to describe a joint *decision* between them to terminate Oates.[6] Rather, it referred to the *implementation* of McDermott's decision on April 22, 1994, when Christenson and McDermott both met with Oates and jointly *informed* him that he was fired.

### 3. Christenson's January 4, 1994, "Write-Up" Was a Criticism of His Performance

In addition to claiming that his discharge was the result of a joint *decision* by McDermott and Christenson, Oates challenges the district court's conclusion that, "Christenson wrote up the Plaintiff in January 1994 for excessive absences, failing to follow proper procedures regarding days off, failing to respond to pages and arriving at work late. [The write up] specified that the procedure for absences was (1) to find a replacement, and (2) after exhausting all possibilities, to call Christenson at home or page her, until reaching her." Specifically, Oates argues that the "write up" was not a criticism of his performance. On the contrary, we disagree and decline to "gloss-over" Oates' repeated absences and are of the belief that the language of the January 14, 1994, "write up" could not reasonably be construed as anything but a warning to Oates for poor past performance. It read, in pertinent part:

> We need to both put in writing, and discuss, each of the following issues that have happened in the past 2 months. These kinds of situations cannot continue in the future.... If these or any other issues to these issues continue to occur, further action will be taken against you.

The last sentence of the preceding passage is especially telling. That is, Christenson expressly referred to Oates' past practices, and warned him that they would not be tolerated in the future. We cannot distill any interpretation from this language other than that Oates was reprimanded for his poor performance with respect to reporting absenteeism.

### 4. Oates Was Terminated as a Result of His Failure to Follow Discovery Zone's Absenteeism Reporting Procedures

Finally, Oates disputes the district court's finding that "Plaintiff was terminated on April 21, 1994 as a result of his failure to follow [Discovery Zone's] absenteeism procedure." In doing so, he claims to have asserted below that Discovery Zone discharged him "because he complained about being racially harassed" and that "he followed the [absenteeism reporting] procedure which was in place at the time of his termination." We agree with the district court's determination that Oates failed to report in accordance with the attendance procedures set forth in Christenson's January 14, 1994, memorandum. While Oates contends that the procedures

---

**6.** In fact, Christenson was asked at deposition, "Was that your decision to fire [Oates]?" She responded with an unequivocal answer of, "No."

detailed in Christenson's January 14 "write-up" of Oates had changed prior to his termination, the record simply does not reflect such a modification of those documented reporting procedures. And the system that was in place could not have been clearer. First, if Oates wished to take a day off of work, for whatever reason, he was required to attempt to find a replacement Technical Support Representative for his shift. Second, were he unable to find a substitute "after exhausting all possibilities," he was to either call Christenson at home and/or page her until she was contacted. Oates followed neither procedure on April 21, 1994. As evidenced by the fact that the Rosemont support center went unmanned during his shift, Oates did not call Christenson at home or attempt to page her. His belated 7:01 a.m. voice-mail message on Christenson's *office* telephone not only ran counter to Discovery Zone's established procedures, but it served little, if any, purpose. Indeed, Christenson typically was not in the office during those hours in which only one Technical Support Representative was scheduled to work (i.e., nights, weekends, and early mornings). The morning of April 21, 1994, was no different. Because Christenson personally "filled-in" whenever an employee, like Oates, reported absent and the support center would have otherwise gone unmanned, it was absolutely essential that she be contacted either by phone at home or paged. Time was of the essence, and Christenson could not have reasonably been expected to repeatedly call into the office at every hour of the day and night, weekends included, to learn whether she was needed as a replacement. As such, Oates' message on her *office* voice-mail (as opposed to having called her at home or paged her) was tantamount to his not having left one at all, for Christenson would have had no way of knowing (absent calling into the office) that her services were required as a substitute Technical Support Representative.

As for Oates' allegation of being racially harassed, Oates never raised a claim therefor in his complaint to the EEOC or the district court. Thus, as we shall discuss at greater length below in Part III.B., he has effectively waived the issue on appeal. Even if we were to consider the question of racial harassment in this case, Oates' disregard for Local Rule 12(n) renders his present argument unmeritorious. Rule 12(n) sets forth what a party to a motion for summary judgment must do, as well as the consequences for failing to do so. *Schulz v. Serfilco, Ltd.*, 965 F.2d 516 (7th Cir.1992). It reads, in relevant part:

> Each party opposing a motion filed pursuant to F.R. Civ.P. 56 shall serve and file, [inter alia,] ... a concise response to the movant's statement that shall contain (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.... All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

By failing to cite to the record or any other supporting materials for his proposition that "he complained about being racially harassed" and by not strictly complying with Rule 12(n), Oates has failed to create a triable issue of material fact with respect to racial harassment. *See Schulz*, 965 F.2d at 516 (Plaintiff's failure to specifically respond to enumerated statement of facts renders age discrimination claim fatal subject to summary judgment); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994) (Where a party fails to support factual averments by specific references to the affidavits, parts of the record and other supporting materials, they are deemed admitted and not subject to dispute). This court cannot construe a fact in favor of a non-moving party when, as here, he has effectively admitted to such fact's truth by reason of non-compliance with Rule 12(n).

### 5. *The District Court Applied the Appropriate Summary Judgment Standard*

Oates further argues, under a separate heading within his Brief, that the district court applied an incorrect standard when it granted Discovery Zone's motion for summary judgment. In our view, this is but a mere reiteration of his position that the dis-

trict court relied on disputed facts to arrive at its conclusion and is, therefore, deserving of little additional attention. As noted earlier, the Federal Rules of Civil Procedure make clear, summary judgment disposition is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All evidence submitted, and any legitimate inference drawn therefrom, must be viewed in a light most favorable to the non-moving party. *Hill v. Burrell Communications Group*, 67 F.3d 665, 667 (7th Cir.1995). Moreover, the summary judgment standard should be applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). In short, for the same reasons articulated in Parts III.A.1–4 above, we hold that the district court adhered to these principles when it granted Discovery Zone's motion for summary judgment.

### B. *Racial Harassment*

Oates next argues that the district court improperly granted summary judgment in favor of Discovery Zone on the issue of racial harassment. While Oates submits that his amended complaint alleged "that the defendant racially harassed the Plaintiff in violation of Title VII," even the most careful reading of the document reveals that no claim was made out therefor. In fact, the term "harassment" simply does not appear in his complaint. As noted above, Oates also failed to set forth a word of harassment at the time he filed his administrative charge of discrimination with the EEOC. Nevertheless, Oates contends that Discovery Zone raised

the racial harassment issue in its Reply Brief, and since he was not given an opportunity to respond, the district court should not have considered the matter or any attendant factual allegations when granting summary judgment.

■ Oates' arguments fail on several grounds. As we have clearly stated on numerous past occasions, "allegations that are not contained in an EEOC charge cannot be contained in a subsequent complaint filed in the district court." [7] *Kirk v. Federal Property Management Corp.*, 22 F.3d 135, 139 (7th Cir.1994); *see also Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993). Racial harassment claims under Title VII are not exempt from this rule. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989) ("With regard to the claim of racial harassment we agree with the district court that [Plaintiff] was barred from raising this claim under Title VII because he had not mentioned it in his administrative charge."). Hence, whether by neglect or design, Oates' decision to exclude the harassment issue from his EEOC charge effectively precluded him from raising it at trial.

Even if we assume, *arguendo*, that Oates did preserve a racial harassment claim for district court resolution, such a claim is not properly before us on appeal because, as "[w]e have repeatedly held[,] . . . it is axiomatic that arguments not raised below are waived on appeal." *Erff v. MarkHon Indus., Inc.*, 781 F.2d 613, 618 (7th Cir.1986) (citations omitted). Here, Oates alleged harassment as an independent claim only *after* the district court entered summary judgment in Discovery Zone's favor. Guided by hindsight and an EEOC amicus brief, he now attempts to overcome his belatedness by arguing that Discovery Zone raised the issue of racial

---

7. A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if his allegations fall within the scope of the charges contained within the EEOC complaint. *Harper v. Godfrey Co.*, 45 F.3d 143, 147–48 (7th Cir.1995). In determining whether an allegation falls within the scope of earlier charges, we examine whether they are "like or reasonably related to" those contained in the EEOC complaint. *Id.* at 148. If they are, we must then ask whether the current claim reasonably could have developed from

the EEOC's investigation of the charges before it. *Id.* Oates suggests neither that his racial harassment allegation is "like or reasonably related to" those contained in his EEOC complaint nor that racial harassment could have reasonably developed from the EEOC's investigation of those charges. Even if such were the case, Oates' failure to include the racial harassment claim in his complaint precludes him from raising it *ex post facto* on appeal.

harassment in its Reply Brief.[8] Interestingly, however, we find no mention of the word "harassment" in either Discovery Zone's Reply or Oates' responsive pleading thereto. While Discovery Zone did refer to the "monkey picture," it was merely replying to Oates' prior recitation of the facts. Had Oates truly believed that the racial harassment issue was "in play" at that moment, he was obligated to have informed the district court accordingly. Instead, he passed over no less than thirteen months [9] of opportunity to raise a Title VII harassment claim. Oates' *ex post facto* attempt at advancing that claim is without merit, and as such, we decline to consider it on appeal.

Our recent decree in *Cheek v. Peabody Coal Co.*, 97 F.3d 200 (7th Cir.1996), supports the foregoing conclusion. In that case, Cheek filed a complaint with the EEOC, charging her employer, Peabody Coal, with sex discrimination. *Id.* at 202. She subsequently brought suit against Peabody Coal for various Title VII violations; the District Court for the Central District of Illinois entered summary judgment against her. *Id.* Although Cheek's complaint did not refer, either directly or indirectly, to sexual harassment, she alleged such a claim in response to Peabody's motion for summary judgment and thereafter appealed based, in part, upon that theory. *Id.* In affirming the district court's ruling, we held that Cheek effectively waived any claim of sexual harassment because it had been omitted from her complaint. *Id.* Here, Oates' basis for appeal stands on far weaker grounds than those which we rejected in *Cheek.* That is, Oates not only failed to allege harassment in his complaint, but unlike in *Cheek,* he did not even raise it in response to Discovery Zone's motion for summary judgment.

### C. Discriminatory Discharge

Oates also contends that the district court improperly granted summary judgment on his claim for discriminatory discharge under Title VII and 42 U.S.C. § 1981. It is well-settled that there exist two methods of approaching Title VII and § 1981 claims. Under the first, a plaintiff can offer direct proof of discriminatory intent to meet his burden of proof. *Von Zuckerstein v. Argonne Nat'l*

---

**8.** Notwithstanding our firm belief that Oates waived any claim for racial harassment by excluding it from his EEOC charge, and even if such were not the case, that the issue is not properly before us on appeal, we think it prudent to address his argument that the district court's consideration of the racial harassment issue unfairly prejudiced him to the extent that he was not afforded an opportunity to respond to factual assertions raised for the first time in Discovery Zone's Reply Brief. Oates finds support for his position in *Garretto v. Elite Advisory Services, Inc.*, 793 F.Supp. 796 (N.D.Ill.1992), wherein the court explained that "[n]ormally, it would be inappropriate for the court to rely upon a factual assertion raised and documented for the first time in the movants' reply memorandum, without at least affording the nonmovant an opportunity to respond to the new assertion." *Id.* at 800 n. 12 (citing *Black v. TIC Investment Corp.*, 900 F.2d 112, 116 (7th Cir.1990)). One need not look far to recognize that the catch-word of this procedural rule is *reliance*—absent a court's reliance on the factual allegations set forth in a movant's reply brief, we are not bound by *Garretto* and/or *Black* to find reversible error when the non-moving party has been denied an opportunity to respond. Here, Oates contests what he regards as judicial "findings" that were based on Discovery Zone's Reply Brief of October 16. Specifically, he challenges two of the district court's statements, which read, to wit:

Defendant avers that Plaintiff's name was not written by Christenson and that it was not written on the picture until after plaintiff's termination;

Defendant offers the opinions of two independent handwriting experts who, after comparing writing samples from plaintiff, Christenson, and other employees, determined that plaintiff himself wrote his name on the picture.

If we accepted Oates' argument that the above-quoted passages were "findings" of fact, we would have little trouble in determining that the district court *relied* on Discovery Zone's Reply, for the existence of a judicial finding connotes reliance. But a "finding," in the legal sense of the word, suggests that the court actually accepted as true the assertions made. That is not the case here. Indeed, the district judge prefaced the aforementioned statements with "Defendant *avers*" and "Defendant *offers*," respectively, without ever having accepted them as true or relied upon them in his analysis. Thus, it is manifest that the district court at no time exercised such reliance on the factual assertions contained within Discovery Zone's Reply, and as such, Oates was not prejudiced by not having had a chance to respond thereto.

**9.** Measured from the date Oates filed his original complaint on November 18, 1994, to the day upon which the district court entered summary judgment, January 5, 1996.

*Lab.*, 984 F.2d 1467, 1472 (7th Cir.1993), *cert. denied*, 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). Alternatively, the indirect, or burden-shifting approach, originally espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), requires a plaintiff to initially establish, by a preponderance of the evidence, a prima facie case of racial discrimination. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Sample v. Aldi, Inc.*, 61 F.3d 544, 547 (7th Cir.1995) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981)). This presumption places upon a defendant the burden of producing "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993)). If the defendant meets this burden of production, the *McDonnell Douglas* presumption "drops from the case" and is no longer relevant. *Id.* (citing *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct at 1095 n. 10). The plaintiff then must prove by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093). In the present case, the district court properly considered both approaches, but found that neither had been satisfied. We agree.

### 1. *Direct Evidence of Discrimination*

Under the direct approach, where a plaintiff is able to prove through direct evidence that the employment decision at issue was based, whether solely or in part, upon his race, color, religion, sex or national origin, he has carried the initial burden of proof. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 568 (7th Cir.1989). Therefore, a plaintiff's so-called "direct" evidence need not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question. *Id.* at 569. "To avoid liability, the defendant must respond by proving by a preponderance of the evidence that it would have made the same employment decision even if it had not taken the impermissible factor into account." *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258–60, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989)).

■ Here, the district court, in granting Discovery Zone's motion for summary judgment, found that Oates "failed to show that a factual issue exists as to whether Christenson's 'stray remarks', ... rather than his poor work performance, resulted in his discharge." *Oates*, No. 94 C 6934 at 3. It then went on to hold that because Oates "failed to show that 'if all of the pertinent facts were as they are' but for his race, he would not have been fired, ... [his] arguments for direct evidence of discrimination must fail." *Id.* at 4. Even if we accept all facts and inferences in a light most favorable to Oates, *see Vukadinovich*, 978 F.2d at 408, we cannot reasonably arrive at any conclusion other than that one reached by the district judge. Although Christenson did relay information to McDermott regarding Oates' chronic absenteeism and poor performance, it was McDermott's independent decision on April 21, 1994, to terminate him. In fact, Christenson's deposition testimony reveals that McDermott called her on April 21 and *told* her that he was going to fire Oates—it was not a matter which was subject to consultation or open to debate.[10] The record is barren of any evi-

---

10. Oates made much at oral argument of Christenson's deposition testimony that McDermott "was ready to" terminate Oates even before he failed to properly report his absence on April 21, and that "[Oates] was not fired because he called in sick on Thursday [April 21]." However, having been "ready to" fire Oates and having "decided to" do so are two very different things. Prior to April 21, McDermott was aware that Oates had, among other documented problems, absented himself from his work assignment without following the established reporting procedures, come to work late, fallen asleep at his desk, and repeatedly taken two-hour lunch breaks. Oates' co-workers complained to management that these habits required them to do all of his work, thereby prompting McDermott to be "ready to" discharge Oates. It was not until

dence suggesting either that McDermott had knowledge of the alleged "monkey picture" prior to that date, or that he considered race as a factor when discharging Oates. McDermott simply refused to allow Oates' repeated absenteeism and manifest indifference towards established corporate procedures and policy to adversely affect Discovery Zone's customer support efforts. Indeed, one might even have questioned McDermott's managerial judgment if he had not timely terminated Oates. But that is not our role—this court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Sample*, 61 F.3d at 551 (7th Cir. 1995) (quoting *Mc Coy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992)).

### 2. *Burden Shifting Analysis*

Under *McDonnell Douglas Corp.*'s indirect, burden-shifting approach, to establish a *prima facie* case of discriminatory discharge, Oates must show that:(1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment decision; and (4) Discovery Zone treated similarly-situated employees outside his classification more favorably. *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994). While Oates did offer evidence as to the first and third elements above, we agree with the district court's determination that he failed to satisfy the second and fourth elements.

Oates initially argues that the district court erred in granting summary judgment because his repeated absenteeism and failure to follow Discovery Zone's attendance reporting procedures was not tantamount to "unsatisfactory job performance." On the contrary, we find them to have been integral to, and a sound measure of, Oates' overall performance. "It almost goes without saying that an employer has a legitimate interest in insuring that each employee's work continues at a steady pace. . . . Reliability and

promptness are important considerations in maintaining a work force." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir.1992). In other words, an employee's "performance" is not necessarily confined to an appraisal of his or her substantive work. Here, the necessity for Oates to follow established attendance policies took on even greater significance when one considers the fact that he was oftentimes the lone Technical Support Representative scheduled to work in Discovery Zone's Rosemont office at any given time. Thus, Discovery Zone was indisputably reliant upon Oates' timely "performance" with respect to ensuring that at least one Technical Support Representative would be present to respond to its customers' calls for emergency assistance.[11]

Oates also asserts that, even if his failure to follow Discovery Zone's attendance reporting procedures is indicative of poor job performance, the *McDonnell Douglas Corp.* test's second element is nonetheless satisfied because, as he explains, "a plaintiff's testimony that he was performing satisfactorily is sufficient to establish a prima facie case under *McDonnell Douglas*." Indeed, we have previously declared that, in certain instances, a plaintiff may meet this component of his *prima facie* case by simply alleging that his job performance was satisfactory. *See Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 923 n. 6 (7th Cir.1988) ("A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, *may be* based solely upon the employee's testimony concerning the quality of his work." (emphasis added)); *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir.1986) ("Yarbrough's testimony that the general quality of his work was satisfactory is sufficient to establish that he met the legitimate expectations of his employer, and hence, to satisfy that element of the prima facie case." (citation omitted)).

Oates' improperly-reported absence on April 21—the proverbial "straw that broke the camel's back"—that McDermott actually "decided" to terminate Oates' employment.

11. The timely provision of emergency systems support was the very service that Discovery Zone offered its FunCenter customers. Discovery Zone hired and retained Oates to provide this service, and ultimately discharged him after he repeatedly failed to do so.

However, neither *Williams* nor *Yarbrough* stand for the blanket proposition that *every* plaintiff who claims that his or her work performance was satisfactory meets *McDonnell Douglas'* second element. Such an interpretation would effectively render that element of the test meaningless. Rather, *Williams* made clear that a *prima facie* showing of satisfactory performance *"may be based solely on the employee's testimony,"* *Williams*, 856 F.2d at 923 n. 6, and the court's *prima facie* determination in *Yarbrough* was limited to the plaintiff's testimony in that particular case. Here, Oates testified that the attendance reporting procedure had changed since Christenson's "write-up" on January 14, 1994, that the "write-up" was not a criticism of his job performance, and that he had properly notified Discovery Zone of his absence on April 21, 1994. However, not only did the January 14 "write-up" expressly admonish Oates for failing to follow proper attendance reporting procedures, but he offers no evidence outside of his undocumented assertion that those procedures had changed. We do not believe that Oates' testimony rises to the level which *Williams* and *Yarbrough* require for a showing that he was meeting the legitimate expectations of his employer.

■ Likewise, Oates fails to demonstrate that Discovery Zone treated similarly-situated employees outside his classification more favorably. While Oates cites *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130 (7th Cir.1994), for the proposition that a reasonable trier of fact may infer that other employees were treated more favorably in cases where the plaintiff is faced with racial epithets, he has once again overstated our holding. In *Lenoir*, we emphasized the "frequency and tolerance of the racial epithets" in concluding *"from the record presented by Plaintiff,* that a trier of fact could reasonably infer that similarly-situated employees were treated more favorably than Lenoir because of her race." *Id.* at 1133 (emphasis added). Here, although we find the alleged "monkey picture," as well as Christenson's refusal to immediately remove it when it was brought to her attention, to have been a display of poor management procedure, as well as distasteful and insensitive, we affirm the district court's determination that Oates has not presented enough evidence to show that non African–American employees working at Discovery Zone were treated more favorably than himself.

### D. *Retaliatory Discharge*

Title VII prohibits an employer from taking adverse employment action or discriminating against an employee simply:

> ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

■ That is, the legislation makes it unlawful for an employer to discharge or otherwise discriminate against an employee because that employee has "made a charge" under Title VII. *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992). "To establish a *prima facie* case of retaliat[ion] [under Title VII], the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that [sic] there is a causal link between the protected expression and the adverse action." *Id.* (quoting *Collins v. Illinois*, 830 F.2d 692, 702 (7th Cir.1987)). In the present case, the district court held that Oates failed to establish the third element above. On appeal, Oates contends that there exists a factual question as to whether McDermott relied upon the information which Christenson provided him before he terminated Oates. We disagree.

This Court has previously held that summary judgment is generally improper where the plaintiff can demonstrate that an employee with discriminatory animus provided factual information or other input that may have affected an adverse employment action. *See Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1459 (7th Cir.1994). Such is not the case here. The record is completely devoid of any evidence suggesting that Christenson relayed any negative information to McDermott about Oates' performance between April 18, 1994—the day Oates alleged-

ly complained to Christenson about the "monkey picture"—and the point at which McDermott decided to discharge Oates on April 21, 1994. Those portions of the record to which Oates cites in support of his contention that "McDermott made his decision [to terminate him] based on factual evaluations and information by Bonnie Christenson, the individual who ... was seeking to get rid of Plaintiff because of his complaints about the racist poster," evidence only one meeting between McDermott and Christenson during the period from August 18 through August 21, 1994. While their discussion at that time did address the "possible ramifications" of discharging Oates, the record reflects that Christenson never provided any input which would have adversely affected McDermott's decision. The requisite "causal link" between Oates' protected expression and Discovery Zone's adverse action is, therefore, nowhere to be found.

### E. Intentional Infliction of Emotional Distress

Finally, Oates contends that the district court improperly granted summary judgment on the merits against his claim for intentional infliction of emotional distress.[12] Specifically, the court below noted that the Illinois Worker's Compensation Act (the "Act"), 820 ILCS 305/1 et seq., typically preempts state law claims, but ultimately concluded that Oates failed to state an actionable claim for intentional infliction of emotional distress.

The Act provides exclusive remedies for claims against an employer for "accidental" injuries in the work place. See Johnson v. Federal Reserve Bank, 199 Ill.App.3d 427, 145 Ill.Dec. 558, 562, 557 N.E.2d 328, 332 (Ill.App.1990); Meerbrey v. Marshall Field & Co., 189 Ill.App.3d 1085, 137 Ill.Dec. 191, 545 N.E.2d 952 (Ill.App.1989). The ambiguity inhering in the term "accidental" appears to have engendered confusion among Illinois courts. On the one hand, Collier v. Wagner, 81 Ill.2d 229, 41 Ill.Dec. 776, 408 N.E.2d 198 (1980), a Supreme Court of Illinois case, would suggest that the Act precludes Oates' claim for intentional infliction of emotional distress since "the employer [Discovery Zone] did not direct, encourage or commit an intentional tort." Id. 41 Ill.Dec. at 781, 408 N.E.2d at 203. In other words, unless Discovery Zone committed, commanded or expressly authorized Christenson's alleged "intentional" conduct, her actions should be deemed "accidental" for purposes of analysis under the Act. Id. 41 Ill.Dec. at 780, 408 N.E.2d at 202; see also Meerbrey v. Marshall Field & Co., 139 Ill.2d 455, 151 Ill.Dec. 560, 564, 564 N.E.2d 1222, 1226 (Ill.1990) ("Because injuries intentionally inflicted by a co-worker are accidental from the employer's point of view, the employer has a right to consider that the injured employee's sole remedy against the employer will be under the worker's compensation statute."). On the other hand, at least one lower Illinois court has construed Collier to mean that "intentional torts, such as infliction of emotional distress ..., fall outside the scope of the Act as they are not accidental.... Thus, the Act does not bar common law actions for intentional torts where the injury was inflicted by the employer or a co-employee acting as the alter ego of the employer." Johnson, 145 Ill.Dec. at 560, 557 N.E.2d at 330. We believe that Holmes v. Razo, 95 C 50405,

---

12. Generally, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendant state-law claims rather than resolving them on the merits," Wright v. Associated Ins. Companies, Inc., 29 F.3d 1244, 1249 (7th Cir.1994) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)), the latter of which was done in the present case. But we shall not concern ourselves with whether the district court erred in continuing to retain jurisdiction over Oates' pendant state law "intentional infliction of emotional distress" claim after it dismissed his federal claims brought pursuant to Title VII and § 1981. Federal Rule of Appellate Procedure 28, whose command this circuit has long enforced, see United States v. Feinberg, 89 F.3d 333, 340 (7th Cir.1996); Wilson v. Giesen, 956 F.2d 738, 741 (7th Cir.1992); United States v. Berkowitz, 927 F.2d 1376, 1391 (7th Cir.1991), cert. denied, 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991), "forces appellants to set forth all of their bases for appeal in their initial brief filed with the court of appeals.... Any issues or arguments of which the appellant may wish to avail himself are forfeited unless proffered in the appellate brief." Feinberg, 89 F.3d at 340. Oates' arguments on appeal fail to address the trial court's jurisdiction to have disposed of his state law claim on the merits, and as such, we do not consider the issue before us today.

1995 WL 444407 at *9 (N.D.Ill. July 15, 1995), a case wherein the court explained that a co-employee's actions are "accidental" unless the employer expressly authorized them or the employer's alter ego committed the tort, properly reconciles the aforementioned inconsistencies. We shall assume, just as the district court did,[13] that Christenson acted as Discovery Zone's "alter ego," and proceed to consider the merits of Oates' claim for intentional infliction of emotional distress.

■ The elements of a cause of action in Illinois for intentional infliction of emotional distress are as follows:

> First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that this conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress.

*McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988). "Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency." *Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976) (citation omitted). Accordingly, the circumstances surrounding a typical employment dispute usually do not rise to the level of extreme and outrageous conduct. *Holmes,* 1995 WL 444407 at *9 (quoting *Piech v. Arthur Andersen & Co.,* 841 F.Supp. 825, 831 (N.D.Ill. 1994) ("A claim for intentional infliction of emotional distress, however, requires more than what is required for sexual harassment.")). "Mere insults, indignities, threats, annoyances, petty oppressions or trivialities," *McGrath,* 127 Ill.Dec. at 727, 533 N.E.2d at

809 (citations omitted), as well as acts which are only "inconsiderate, rude, vulgar, uncooperative, unprofessional and unfair," *Pommier v. James L. Edelstein Enter.,* 816 F.Supp. 476, 482 (N.D.Ill.1993) (quoting *Miller v. Equitable Life Assur. Soc'y,* 181 Ill.App.3d 954, 130 Ill.Dec. 558, 560, 537 N.E.2d 887, 889 (1st Dist.1989)), do not constitute conduct which is actionable under a theory of intentional infliction of emotional distress. While we believe that Christenson's alleged actions (i.e., her refusal to remove the "monkey picture") might exhibit some of these traits, we refuse to go so far as to characterize them as "truly extreme and outrageous," *McGrath,* 127 Ill.Dec. at 727, 533 N.E.2d at 809, or "beyond all possible bounds of decency." *Public Fin. Corp.,* 4 Ill.Dec. at 654, 360 N.E.2d at 767. We, therefore, affirm the district court's grant of summary judgment against Oates' state law claim.

Our conclusion is wholly consistent with this Court's decision in *Harriston v. Chicago Tribune Co.,* 992 F.2d 697 (7th Cir.1993). In that case, we considered the plaintiff-appellant's claim for intentional infliction of emotional distress in the face of numerous allegations of discriminatory conduct against her employer, including, to wit:

> not being allowed to supervise two white subordinates; being reprimanded for no reason; being refused participation in [her employer's] Management Incentive Fund; being forced out of her management position as EEO/Employment Manager; being promised a promotion in advertising she was never given; having a major account . . . taken away from her and being given one of the least lucrative sales territories; being excluded from office activities; not being advised of changes in policy and being reprimanded for asking about such changes; being falsely accused of having poor sales; being threatened with disci-

---

**13.** Specifically, the district court explained:
Illinois courts have held that the Illinois Worker's Compensation Act preempts such state law claims. However, Illinois recognizes several exceptions, including when the alleged injurer is an 'alter ego' of defendant. However, even if we assume that Christenson is an 'alter ego' of defendant, plaintiff has failed to state an actionable claim.

*Oates v. Discovery Zone,* 94 C 6934 at 5 (citations omitted).
Therefore, the district court did not expressly hold that the Act preempted his pendant state law claim. Accordingly, we shall not consider Oates' argument that the district court improperly granted summary judgment against him on the basis that the Act preempted his intentional infliction of emotional distress claim.

pline; having her telephone calls monitored through the use of an eavesdropping device; having her private vehicle damaged on several occasions in [her employer's] parking lot and having [her employer's] management ignore her concern for her property and personal safety.

*Id.* at 703. We ruled that such assertions did not reach the level of extreme and outrageous action necessary to establish a claim for intentional infliction of emotional distress. *Id.* Here, Oates has alleged but one relatively isolated incident of racial insensitivity which, in light of *Harriston*, cannot reasonably be construed as conduct that is "truly extreme and outrageous."

## IV. CONCLUSION

The standard governing summary judgment is clear: "[I]f no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment *must* be granted." *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655, 660 (7th Cir.1991) (emphasis added). This court recognizes that "[c]aution is required in granting summary judgment," *id.,* especially in cases of alleged racial discrimination. However, we have also noted that summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mills v. First Federal Sav. & Loan Ass'n,* 83 F.3d 833, 846 (7th Cir.1996) (quoting *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992), *aff'd,* 991 F.2d 801 (8th Cir.1993)). Such is the case presently before us on appeal. Even considering the record in the light most advantageous to Oates, we conclude that there exist no genuine issues of material fact which would warrant a jury's consideration. The district court's entry of summary judgment is

AFFIRMED.

DIANE P. WOOD, Circuit Judge, concurring in part and dissenting in part.

Arthur Oates raised claims under both federal civil rights laws and state law in connection with his discharge from Discovery Zone. Although I agree with the majority that his claims under Title VII and 42 U.S.C. § 1981 were correctly dismissed on summary judgment, I dissent from its decision to affirm the dismissal of Oates' claims under state law.

As the majority opinion spells out in greater detail, Oates was employed by Discovery Zone as a Technical Support Representative. He worked at the Rosemont, Illinois, technical center, where he was the only African–American on the staff. The undisputed facts show that Oates had a serious problem with absenteeism, which his supervisor Bonnie Christenson documented in a memorandum of January 14, 1994. It is also undisputed that Oates was absent from work on at least eight occasions between January 14, 1994, and April 21, 1994.

Mark McDermott began his job as Manager of Corporate Information Services for Discovery Zone on February 28, 1994. It was not until early April 1994 that he started to oversee the Rosemont support center. This oversight meant that he was Christenson's supervisor. Shortly after he assumed his new responsibilities over Rosemont, he met with Christenson to discuss her personnel. Christenson immediately alerted him to Oates' absenteeism and told him that she and McDermott's predecessor were "on the path" to firing Oates.

Around the same time, Christenson placed the infamous "monkey picture" on the bulletin board at the Rosemont office. Somehow, five other duplicates of the picture also appeared around the office. At some time prior to April 18, Oates' first name (Art) was written above one of the monkeys. Oates was deeply offended by this display and promptly complained to Christenson. Instead of taking his complaint seriously, she brushed it off and told Oates that he was being "over-sensitive." The picture remained on public display, complete with Oates' name, for more than a week.

On April 21, Oates again failed to show up at work on time. To make matters worse, he did not comply with Discovery Zone's express policies about reporting tardiness or

absence to his supervisor. Instead, he just telephoned Christenson's office number and left a voice mail message indicating that he would be late. This meant that the support center was left completely unattended until McDermott received a complaint from a customer and paged Christenson, who was by then on her way to the office. Oates does not dispute that he was late, that he failed to contact Christenson by pager or at home, or that the center was unattended by support personnel. Based on his knowledge of Oates' earlier problems, which he gained from Christenson, McDermott claimed that he decided to terminate Oates that day. With the approval of Discovery Zone's Vice President of Human Resources, both McDermott and Christenson met with Oates in Christenson's office on April 22, 1994, and informed him that he was being discharged.

Oates' complaint to the EEOC detailed the events surrounding the offensive "monkey picture" incident and Christenson's refusal to take any action about it. The same is true of his complaint in the district court. As we have repeatedly held, it is enough both for EEOC charges (see *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 864–65 (7th Cir.1985); *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 169 (7th Cir.1976) (*en banc*)) and for federal court complaints (see *Sledd v. Linsday*, 102 F.3d 282, 288–89 (7th Cir.1996); *Homeyer v. Stanley Tulchin Associates, Inc.*, 91 F.3d 959, 961 (7th Cir.1996)) to set forth the facts that will form a basis for relief. Plaintiffs are not under any obligation to plead legal theories, which means that the absence of the phrase "racial harassment" in Oates' complaint is of no legal significance.

Rather than review the facts Oates alleges are disputed in isolation from the claims he has raised, I consider them only insofar as they bear on the correctness of the district court's decision to grant summary judgment on each count. Beginning with his Title VII claims, Oates has alleged both that he was discharged for racially discriminatory reasons and that he was forced to endure a racially harassing environment. In order to prove that his discharge violated the statute, he either had to present direct evidence that it was racially motivated or he had to satisfy the well-worn indirect method introduced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Oates claims that he wins either way. It was Christenson's input that caused McDermott to fire him, according to Oates, and the "monkey picture" evidence showed that Christenson herself was biased against Oates because of his race. Alternatively, he claims that he meets all four of the requirements for a *McDonnell Douglas* prima facie case: (1) he is a member of a protected class, (2) he was performing his job satisfactorily, (3) he was fired, and (4) Discovery Zone did not treat similarly situated employees in the same adverse way.

I do not agree with the majority that the undisputed evidence shows that McDermott unilaterally and independently decided to fire Oates. A jury could believe that McDermott, who had only been working with the Rosemont technical center since early April 1994, could not have made such a decision without relying heavily on Christenson's recommendation and the information that she furnished to him. This court has held that such a link is enough to require consideration of the recommender's role in the employment decision. *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1459 (7th Cir.1994) (summary judgment improper "where the plaintiff can show that an employee with discriminatory animus provided factual information that may have affected the adverse employment action"); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990). Unfortunately for Oates, however, bringing Christenson into the mix hurts more than it helps. Oates cannot contest the fact that he had a serious absenteeism problem, which he had been strongly advised to remedy. (It is immaterial whether we call the January 14 memorandum a "reprimand" or something else; the message is clear that Oates had to shape up or suffer the consequences.) Whatever Christenson may have told McDermott, and whatever her motivations behind providing that information, it is clear that she advised McDermott that Oates was skating on thin ice because of his unexcused, unnotified absences from the workplace. McDermott himself testified that this absenteeism was the sole reason for his

decision. Under the circumstances, I would find only that Christenson's alleged racially discriminatory attitude is too remote from the final decision to terminate Oates' employment to satisfy the standards we have established for proof of discrimination through "direct" evidence. See *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). Oates must therefore rely on *McDonnell Douglas* to save his discriminatory discharge claim.

Oates, however, runs into the same problem with the *McDonnell Douglas* approach. It is not necessary for us to show that he *fails* on all four parts of the test, because as the plaintiff he must come forward with evidence to *establish* all four parts before the burden-shifting process moves forward. It is clear that Oates did not produce enough evidence to show that he was performing his job satisfactorily. That is enough in itself to defeat his prima facie case and to justify summary judgment for Discovery Zone. See, for example, *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 798 (7th Cir.1995); *Villa v. City of Chicago,* 924 F.2d 629, 631 (7th Cir.1991). For the record, I disagree with the majority that Oates failed to show that Discovery Zone treated similarly situated employees more favorably than Oates. Oates, after all, was the only African–American at the Rosemont facility, and there is no evidence that white employees were presented with materials (if there are such things) that they would have found as racially offensive as an African–American would reasonably find the "monkey picture." This, however, makes no difference to the outcome, given Oates' failure to establish the element requiring satisfactory performance.

As with the discharge claim, I would find that Oates adequately pleaded a racial harassment claim. The fact that litigants do not have an obligation to plead legal theories does not, however, mean that they are exempt throughout the litigation from informing their opponent and the district court about the legal theories on which they rely. The normal point at which this obligation arises is when the opposing party files a motion for summary judgment. Such a motion not only asserts that there are no genuine issues of material fact, but just as importantly it argues that the moving party is entitled to judgment as a matter of law. We have held, therefore, that the failure to articulate legal theories at this stage constitutes waiver, even if those theories were viable at the pleadings stage. See *Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 588 (7th Cir.1992); *Geva v. Leo Burnett Co., Inc.,* 931 F.2d 1220, 1225 (7th Cir.1991).

I do not agree that Oates failed to comply with his obligation under Local Rule 12(N) to give record cites to show support for his argument that he was racially harassed. His response made it clear that the "monkey picture" incident had occurred, that he had complained to Christenson about the poster, and that she compounded the initial injury by refusing to take immediate action to remove it. Nevertheless, I do agree that Oates raised the legal theory of racial harassment too late in the day, and for that reason he waived the right to rely on it in the district court and here. It was not until after the district court entered summary judgment for Discovery Zone that Oates, in a motion to reconsider, first tried to raise this claim. Had it been properly before the district court, I agree with the *amicus* brief filed by the Equal Employment Opportunity Commission that it would not have been a proper candidate for summary judgment. On this record, I cannot fault the district court for failing to consider a legal theory that was not presented to it at the proper time. Oates should have known, when Discovery Zone filed its motion for summary judgment on the entire case, that the moment had arrived to put his cards on the table. He did not, and it is too late now to revive a claim based on racial harassment.

Oates has two remaining federal claims: his claim under 42 U.S.C. § 1981 for discriminatory discharge and his claim under Title VII for retaliatory discharge. The standards for proving a § 1981 claim are, in this context, basically the same as the standards governing his Title VII discriminatory discharge claim. See *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568 (7th Cir.1989). I agree with the majority that Oates' failure to bring forth enough evidence

to show either direct or indirect discrimination in his discharge is dispositive for the § 1981 claim as well. I also agree with the majority's ultimate conclusion—though not its reasoning—that Oates' retaliation claim fails because he did not show a genuine issue of fact on whether there was a causal connection between any protected expression in which he engaged and his adverse employment action. I assume that the protected expression is Oates' complaint to Christenson about the poster, as this would amount to opposition of a practice (creating a racially hostile environment) that is prohibited by Title VII.

The majority asks too narrow a question when it notes that there is no evidence that "Christenson relayed any negative information to McDermott about Oates' performance between April 18, 1994—the day Oates allegedly complained to Christenson about the 'monkey picture'—and the point at which McDermott decided to discharge Oates on April 21, 1994." Oates' theory of the case is that Christenson was a racially biased supervisor who was trying to get rid of him. The principal evidence he offers for that contention is her reaction to the "monkey picture." That does not mean, however, that he is arguing that she woke up on the morning of April 18 and suddenly developed racist inclinations. Any input at all that she furnished to McDermott, under Oates' theory, would have been tainted. Here again, however, Oates cannot dispute the fact that most of Christenson's input related to the objectively verifiable and uncontested fact that he was absent a great deal of the time. It is also clear that the decision to fire him was certainly not Christenson's alone to make; at best, she provided the background information on which McDermott (and perhaps the Human Resources Vice President, who also signed off on the termination) relied. As before, the chain of causation between Oates' complaint to Christenson and Discovery Zone's ultimate decision to fire him is too attenuated to satisfy the prima facie case of retaliation. Furthermore, even if we found the prima facie case satisfied, the same evidence about Oates' absenteeism provides Discovery Zone with an unassailable legitimate, nonpretextual reason for taking the action it did.

The final point on which I disagree with the majority relates to its handling of Oates' state law claim for intentional infliction of emotional distress. As it acknowledges (opinion at n. 12), the general rule is that when all federal claims are dismissed before trial, the district court should relinquish its jurisdiction over any supplemental state claims rather than resolving them on the merits. See *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir.1997); *Boyce v. Fernandes*, 77 F.3d 946, 951 (7th Cir.1996). Oates' failure to address this in his appellate brief is not dispositive in my view, because, even if not a strictly jurisdictional issue for purposes of 28 U.S.C. § 1367, it is a matter that relates closely to the allocation of jurisdiction between the federal and the state court. The majority concedes that Illinois law is not clear on the question whether the Illinois Worker's Compensation Act, 820 ILCS 305/1 *et seq.*, does or does not preclude a claim for intentional infliction of emotional distress. For this reason, I think it is especially appropriate for this court to follow the general rule and to order dismissal of the supplemental claim without prejudice. Furthermore, the majority cannot resolve the claim even under its own assumptions without drawing a conclusion about exactly how offensive the poster was, what Christenson's motivations were, and how Oates should have responded. These are all jury issues (based on this record) which should not be resolved adversely to Oates on summary judgment.

I would therefore affirm the district court's decision granting summary judgment to Discovery Zone on Oates' claims arising under Title VII and 42 U.S.C. § 1981, and I would reverse and remand its decision on the state law claim for intentional infliction of emotional distress, with instructions to dismiss that claim without prejudice.