129 F.3d 120
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Eric WASHINGTON, Plaintiff-Appellant,
v.
CHICAGO OSTEOPATHIC AMBULATORY CARE FACILITIES, Defendant-Appellee.
 No. 96-3738.
 United States Court of Appeals, Seventh Circuit.
 Oct. 6, 1997.
 
 1
 Hon. Richard A. POSNER, Chief Judge, Hon. Richard D. CUDAHY, Circuit Judge and Hon. Kenneth F. RIPPLE, Circuit Judge
 
 ORDER
 
 2
 Eric Washington, an African-American, brought a wrongful termination suit against his former employer Chicago Osteopathic Ambulatory Care Facilities ("Chicago Osteopathic"), alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. The defendants moved for summary judgment which the district court granted on October 3, 1996, concluding that Mr. Washington had failed to make a prima facie case of discrimination. The district court concluded that Mr. Washington had not demonstrated that a genuine issue of material fact existed as to whether he was performing to Chicago Osteopathic's legitimate expectations or whether he was treated less favorably than similarly situated employees. The district court also concluded that even if Mr. Washington had established a prima facie case of discrimination, he had not created a genuine issue of material fact as to whether Chicago Osteopathic's stated reason for the termination was pretextual. Mr. Washington filed a timely notice of appeal. We affirm.
 
 I. BACKGROUND
 
 3
 Chicago Osteopathic operated off-site ambulatory care clinics which were used for outpatient care. The clinics were part of an Ambulatory Care Network ("ACN") with locations centralized in the inner city areas of Chicago. Eric Washington was hired by Joyce Johnson, the Administrator of the Ambulatory Care Network, on August 22, 1990, as one of three Assistant Administrators for Chicago Osteopathic. As an Assistant Administrator, Mr. Washington worked in collaboration with Johnson and the office managers of each clinic to provide the day-to-day management and staffing of the clinics, a responsibility which both parties agree was the priority for each Assistant Administrator. The Assistant Administrators were primarily responsible for part of the clinics and also had general responsibilities that related to all of the clinics. Mr. Washington initially was assigned ten clinics for which he had direct responsibility, and, in addition, he was responsible for maintenance in all of the clinics.
 
 
 4
 Of the two other Assistant Administrators who were employed when Mr. Washington was hired, one was Caucasian and one was Iranian. Mr. Washington was hired to replace Debra Taylor, an African-American female who left her position voluntarily. His term of employment began on September 10, 1990, subject to a 90-day probationary period which was standard for all new employees pursuant to the Chicago Osteopathic Employee Handbook. Mr. Washington admits that he received a copy of the handbook and understood that the provisions of the handbook applied to him. Mr. Washington received his performance review from Johnson for his probationary period over the course of several days during the week of January 7, 1991, in both an oral and a written form.[1] The review stated that Mr. Washington needed to improve in four areas, including: (1) interpersonal and communication skills, (2) prioritization and time management, (3) communications, and (4) follow-through. Specifically, with respect to the areas requiring improvement, Johnson's evaluation stated:
 
 I. Interpersonal and Communication Skills
 
 5
 The ACN Centers and staff tends [sic] to be "nuclear families" within themselves and "extended families" among the other Centers and the ACN Administrative Office. You do not communicate well with individuals and have a tendency to offend by not explaining, asking, or offering a rationale. You need to understand that staff must feel that we work with and for them, not that they work for us. The ACN Administrative office is to help the Center, staff and physicians provide optimum, cost-effective patient care. Staff situations require interaction in a nonjudgmental fashion.
 
 
 6
 You must communicate at the level of the employee, both verbally and in written form. Many calls are received in the ACN Administrative office requesting "interpretation." Frequently, the perceptions [sic] of persons requesting such clarifications is that they are "looked down on", or "talked down to".
 
 
 7
 Your written communication can be greatly simplified decreasing confusion or the need for interpretation as well as time spent both writing and processing such lengthy or complicated communication.
 
 2. Prioritization and Time Management
 
 8
 The first priority in [sic] the medical care environment. Time management must include communication of problems and on-going projects or issues to follow-up with correspondence, as needed. You appear to enjoy the peripheral tasks more than the day-to-day activity. Day-to-day is priority.
 
 3. Communication
 
 9
 Improvement is anticipated in calling in for messages, letting support staff know where you are, (daily, general). Contact Centers at least twice a week. Ask if the have a few minutes.
 
 4. Follow-through
 
 10
 Attention to detail, again, suggesting the use of a tickler system.
 
 
 11
 R. 22, Loose Pleadings, Vol. 1, Exh. A., Exh. 9. Johnson's evaluation also stated that there were "critical weaknesses" in his performance which needed to be addressed, and she extended his probationary period an additional 60 days.
 
 
 12
 Johnson advised Mr. Washington that during this extended period, she expected him to meet with her on a daily basis to discuss his activities, to schedule bi-weekly formal meetings with Johnson (or her secretary) in order to set goals for him and evaluate his progress in certain areas, and to provide her with a written response to the evaluation.
 
 
 13
 Johnson also discussed Mr. Washington's weaknesses with him in a meeting on January 14, 1991. During this meeting, Johnson offered specific examples of the areas of improvement cited in his 90-day evaluation and how he might rectify his communication problems and inattention to detail with respect to staff coverage and responding to people. Pl. Answer to Def. Statement of Material Fact, p 29. Mr. Washington admits that during this meeting he assured Johnson that she would start to see improvement in his performance. Id. At around this same time, Johnson hired Jennifer Kramer, a manager at one of the defendant's clinics for eight years, to begin training for the position of a fourth Assistant Administrator, a position which Johnson admitted was "short-lived" and was eliminated after Kramer took Mr. Washington's position upon his termination. Mr. Washington asserts that Johnson approached him soon after Kramer started and asked him to give up half of his centers to Kramer to provide her with her own centers and because he had "too much on his plate." He refused.
 
 
 14
 Chicago Osteopathic asserts that Mr. Washington did not completely comply with the conditions of his extended probationary period, and that complaints about Mr. Washington continued to be reported to Johnson. Consequently, on January 25, 1991, Johnson told Mr. Washington that the position was not working out and that he should begin to seek other employment. She also stated that he could resign by March 15, 1991, and if he did not, she would terminate him on February 8.[2]
 
 
 15
 On February 6, 1991, Johnson had a meeting with Mr. Washington in which she gave him a memorandum entitled "Unsatisfactory Performance" which documented Mr. Washington's performance since his prior evaluation in early January.[3] Mr. Washington was suspended without pay on February 8, 1991. He asserts that Johnson told him that the suspension was for insubordination for not saying good morning to her that day. Chicago Osteopathic claims that Mr. Washington was suspended because he failed to meet with Johnson on February 7, 1991, as she requested. Mr. Washington was terminated on February 11, 1991, after Johnson received a Termination of Employment memorandum from Chicago Osteopathic's Human Resources VicePresident, Theresa Banaszak. Mr. Washington admits reviewing and signing the termination memorandum.
 
 
 16
 Mr. Washington's version of the events which led up to his termination includes additional allegations. He testified, for example, that Johnson had told him on two occasions in January 1991 that she would make up any information she felt she had to in order to justify his termination. He also stated that she warned him not to speak with his co-workers about her statements that she would fabricate information or tell them about the threats she had made. In addition, Mr. Washington testified that Johnson had made several derogatory statements about African-Americans while he was employed at Chicago Osteopathic. For instance, he stated that she had told all of the Assistant Administrators to be careful about hiring AfricanAmericans "because they can't speak correctly."[4] He also testified that Johnson told him in approximately November 1990 to "quit trying to talk like you're white" and to "get all those dictionaries off your desk and quit acting like you're white." R.23, Exh. B at 132-35. He also stated that while taking a potential client on a tour of one of the clinics in or around December 1990, Johnson told the personnel director of the potential client not to be alarmed at the dark complexion of one of the clinic's physicians because although he was AfricanAmerican, the picture was taken soon after a vacation in the sun. Id. at 156-66. Mr. Washington also stated that Johnson told him that other employees at the clinics did not like him. In its Answer to the Complaint, Chicago Osteopathic denies that the statements mentioned above were made by Johnson.[5]
 
 
 17
 Mr. Washington filed discrimination charges with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"). He received a rightto-sue letter from the EEOC on February 6, 1995, and filed this suit under Title VII in May 1995.
 
 II. STANDARD OF REVIEW
 
 18
 We review a grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party. Denisi v. Dominick's Finer Foods.Inc., 99 F.3d 860, 864 (7th Cir.1996); Fuka v. Thomson Consumer Electronics, 82 F.3d 1397, 1402 (7th Cir.1996). Summary judgment is appropriate if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). If the nonmoving party bears the burden of proof on an issue, however, that party may not rest on the pleadings and must instead show that there is a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion. Courtney v. Biosound, 42 F.3d 414, 418 (7th Cir.1994) (citing Sarsha v. Sears. Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir.1993)). However, "[w]here the nonmovant bears the burden of proof at trial, as he does here, he must put forth 'specific facts showing that there is a genuine issue for trial.' " Essex v. United Parcel Serv., 111 F.3d 1304, 1308 (7th Cir.1997) (quoting Celotex, 477 U.S. at 324). "A mere scintilla of evidence in support of the nonmovant's position is insufficient." Id. The summary judgment standard is applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Courtney, 42 F.3d at 418 (quotation omitted).
 
 III. DISCUSSION
 
 19
 Under Title VII, an employer is prohibited from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e2(a)(1) (1994). "The central question in any employmentdiscrimination case is whether the employer would have taken the same action had the employee been of a different race ... and everything else had remained the same." Carson v. Bethlehem Steel Corp., 82 F.3d 157, 158 (7th Cir.1996) (per curiam) (citing Gehring v. Case Corp., 43 F.3d 340, 344-45 (7th Cir.1994)). While an employee may attempt to demonstrate the alleged discrimination directly or indirectly, Mr. Washington relies upon indirect evidence as the basis for his claim, the test for which is articulated in McDonnell-Douglas v. Green, 411 U.S. 792 (1973). Under the well-known McDonnell-Douglas test, Mr. Washington first must establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class, (2) he performed his job satisfactorily, (3) he suffered an adverse employment action, and (4) the defendants treated similarly-situated employees more favorably. See McDonnellDouglas, 411 U.S. at 802. If the plaintiff succeeds in establishing his prima facie case, it "creates a presumption that the employer unlawfully discriminated against the employee." Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant to introduce evidence that it had a legitimate, nondiscriminatory reason for the adverse action. Id. If the defendant makes this showing, the presumption of discrimination is eliminated and the plaintiff must demonstrate by a preponderance of the evidence that the defendant's stated reason for the action was merely a pretext for discrimination. Id. at 253. Thus, Mr. Washington bears the ultimate burden of persuasion to show intentional discrimination despite the interim burden-shifting process of the McDonnell-Douglas analysis. Id.
 
 A. Prima Facie Case
 
 20
 1. Did Washington perform his job satisfactorily?
 
 
 21
 Mr. Washington first argues that the district court erred in holding that he did not establish a prima facie case of discrimination because he failed to demonstrate that he had performed his job satisfactorily. Mr. Washington claims that he can meet his prima facie requirement regarding his performance through his own testimony. Williams v. Williams Electronics. Inc., 856 F.2d 920, 923 n. 6 (7th Cir.1988)[6]; see also Weihaupt v. American Med. Ass'n, 874 F.2d 419, 427-28 (7th Cir.1989) (plaintiff's testimony that plaintiff possessed abilities to meet job requirements was sufficient to establish prima facie requirement that individual was performing to employer's legitimate expectations). Accordingly, he asserts that because he has controverted or offered explanations for each of the alleged deficiencies, he has established genuine issues of material fact with regard to his performance.
 
 
 22
 We review the specific instances cited by Chicago Osteopathic in support of their claims that he did not perform to its expectations. Several of the complaints about Mr. Washington came from Lisa Laurie, a manager at the Glenwood clinic, one of the clinics for which Washington had primary responsibility. Chicago Osteopathic first points to Johnson's deposition testimony that Laurie had called her on January 16, 1991, "very, very upset" about ongoing problems with Mr. Washington. Mr. Washington admits that this phone call occurred and further admitted that "Laurie told Johnson that she had some ongoing issues with Mr. Washington and that she tried to talk to [sic] them over with him." Loose Pleadings, Vol. 2, Pl. Answer to Defendant's Statement of Material Facts, p 32. However, Washington asserts that Johnson should have viewed Laurie's complaints with skepticism because she was aware that Washington and Laurie had had previous confrontations.[7]
 
 
 23
 In addition, Chicago Osteopathic stated that on January 28, 1991,[8] Mr. Washington had scheduled an individual for an interview at Laurie's clinic at a time when she was not scheduled to be there. Mr. Washington, however, asserts that he was told by another manager at the clinic that Laurie or the assistant manager would be able to meet with the interviewee.[9] Further, Mr. Washington admits that on January 28, 1991, Laurie called Johnson to report a physician coverage problem at one of her clinics. Mr. Washington argues that he was not responsible for the staffing shortfall because a staff member had called in sick making it difficult to find a replacement. Again, on January 31, 1991, Kramer reported to Johnson that staffing had not been coordinated for the Glenwood clinic for February 2, 1991. Washington rebuts this claim by asserting that another Assistant Administrator was responsible for staffing the clinic on February 2, 1991. Appellants Br. at 20-22. Accordingly, Mr. Washington has rebutted the performance deficiencies and complaints as they relate to Laurie.
 
 
 24
 However, in addition to the complaints from Laurie, Chicago Osteopathic also states that on or about February 1, 1991, Johnson received a phone call from the answering service for two clinics advising her that Mr. Washington did not provide them with corrected staffing schedules. In addition, at around the same time, Frederic Schwartz, M.D., Johnson's supervisor, had informed her that he was receiving several telephone calls from doctors complaining that staff and physician coverage had not been arranged, and that plant and facility issues he had discussed with Mr. Washington had not been taken care of.
 
 
 25
 Mr. Washington denied that the February 1 phone calls from the answering services or that the phone calls between Schwartz and Johnson took place, and rebuts these assertions only by stating that he was performing to expectations. R.23, Plaintiff's Answer to Defendant's Statement of Material Facts, pp 30, 31, and 42, Loose Pleadings, Vol. 2.[10] These calls indicate that Johnson continued to receive complaints about Washington's ability to provide correct and complete staffing schedules, a task which both parties agree was a priority for an Assistant Administrator. Johnson discussed her continuing concerns in a meeting with him on January 25, 1991, during which she stated that she believed the position was not working out. She documented his "unsatisfactory performance" in a February 6, 1991, memorandum to him and suggested they decide on a "mutually agreeable termination." R.22, Exh. A, exh. 11.
 
 
 26
 In addition, Mr. Washington admits that he did not arrange "that much" to meet with Johnson's secretary, Sheila, even though Johnson requested in the 90-day evaluation that he meet with Sheila twice a week. R.22, Exh. A at 94. Further, Mr. Washington acknowledges that he failed to submit a written response to his performance evaluation as she requested in his initial review. Pl. Answer to Def. Statement of Material Fact, p 26. Accordingly, he has not rebutted each and every "deficiency" as asserted by Chicago Osteopathic. Thus the district court correctly concluded that Mr. Washington had not established a prima facie case that he was performing to Chicago Osteopathic's legitimate expectations.
 
 
 27
 2. Did Chicago Osteopathic treat similarly situated employees outside Mr. Washington's classification more favorably ?
 
 
 28
 Mr. Washington also argues that the district court erred in concluding that he had not proven that others similarly situated were treated more favorably than Mr. Washington. He first asserts that he was treated less favorably than the other two Assistant Administrators because he was fired and they were not. The district court rejected this argument because Mr. Washington did not put forth any evidence that the two other Assistant Administrators were not performing their jobs to expectations and thus were not similarly situated. We agree that Mr. Washington has not offered any evidence that a probationary Assistant Administrator outside his classification was treated more favorably than he was after complaints had been received about that person's performance.
 
 
 29
 Mr. Washington argues that one of the problems attributed to him was actually the fault of another Assistant Administrator; thus, he concludes, that individual was also performing below expectations and was treated more favorably because he was not terminated. Even if it is true that another Assistant Administrator was responsible for one of the problems attributed to Mr. Washington, he does not establish that the other Assistant Administrator was encountering the same type of, and same number of, complaints asserted against Mr. Washington by Chicago Osteopathic. In addition, Mr. Washington admits in his brief that the other Administrator's probationary period was not extended while his was, thus defeating his claim that the two were similarly situated.
 
 
 30
 Mr. Washington also asserts in a somewhat circular argument that the district court failed to view the evidence in a light most favorable to him and thus incorrectly concluded that he was performing deficiently. He argues that he was similarly situated because, viewing the evidence in a light most favorable to him, he was not performing below expectations and thus was similarly situated to the other employees. While the court must view the facts in a light most favorable to Mr. Washington at this stage, the facts demonstrate, and Mr. Washington acknowledges, that Johnson was receiving complaints about his performance. Asserting that the complaints were not wellfounded does not establish that he was being treated differently than similarly situated employees.
 
 
 31
 Mr. Washington also argues that another Assistant Administrator who was fired, Janice Brannon, was given more time than Mr. Washington to find alternative employment, thus demonstrating that he was treated less favorably. However, Brannon and Mr. Washington were not similarly situated because Brannon was no longer a probationary employee when she was terminated. Further, she agreed to resign and had requested more time to find another job, while Mr. Washington did not. Thus, it appears that the district court did not err in concluding that Mr. Washington has not sufficiently demonstrated that he was treated less favorably than similarly situated employees.
 
 B. Pretext
 
 32
 Even if we were to conclude, however, that Mr. Washington has established a prima facie case of racial discrimination, the burden of production shifts to Chicago Osteopathic to produce a legitimate, nondiscriminatory reason for the termination. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir.1997). Chicago Osteopathic asserts that Mr. Washington's termination was performance-based, not race-based, and has submitted his original 90-day probationary review and his termination memorandum in support of this claim. This is sufficient to meet their relatively light burden of production. See EEOC v. Our Lady of the Resurrection Med. Center, 77 F.3d 145, 150 (7th Cir.1996).
 
 
 33
 Thus, the burden shifting structure of the McDonnellDouglas analysis becomes irrelevant and Mr. Washington must prove by a preponderance of the evidence that Chicago Osteopathic's reason for terminating him was pretextual. Plair, 105 F.3d at 348 ("to survive summary judgment, [the plaintiff] must advance facts from which a reasonable jury could infer that [the defendant] fired him for discriminatory reasons"). "The pretext inquiry focuses on the honesty--not the accuracy--of the employer's stated reason for the termination." Tincher v. WalMart Stores, Inc., No. 96-2713, 1997 WL 340547, at * 5 (7th Cir. June 20, 1997). Mr. Washington can demonstrate pretext by showing that Chicago Osteopathic's reasons for firing him are "(1) factually baseless, (2) not the actual motivation for the discharge, or (3) insufficient to motivate the discharge." Id. (citing Wolf v. Buss (America), Inc., 77 F.3d 914, 919 (7th Cir.1995)).
 
 
 34
 Mr. Washington has failed to meet this standard of proof. Even assuming that his own testimony may have been sufficient to establish a prima facie case, it does not prove by a preponderance of the evidence that Chicago Osteopathic intentionally discriminated against him when it fired him. Mr. Washington first attempts to show pretext by asserting that any complaints of his performance either did not occur or were someone else's fault. However, "simply shifting the blame for a problem does not establish pretext." Wohl v. Spectrum Mfg.. Inc., 94 F.3d 353, 357 (7th Cir.1996) (citing Schultz v. General Elec. Capital Corp., 37 F.3d 329, 334 (7th Cir.1994)). In order to demonstrate pretext, Mr. Washington must show that Chicago Osteopathic lied about its reason for firing him. Wolf, 77 F.3d at 919.
 
 
 35
 Although he asserts that he has rebutted Johnson's allegations of poor performance, at this stage, self-serving comments alone will not permit the plaintiff to survive summary judgment. Weihaupt, 874 F.2d at 428 (in meeting his burden at this point in the analysis, the plaintiff "must do more than challenge the judgment of his superiors through his own selfinterested assertions") (quotation omitted). More important, however, is that even if Mr. Washington has rebutted each allegation of deficient performance at this stage of the litigation, he provides no indication that Johnson knew that all of the alleged performance deficiencies were not his fault but still held him responsible in order to provide a basis for firing him. Washington asserts that Johnson stated that she would make up any false information necessary in order to fire him. However, Washington does not deny that Johnson received complaints about him. Although he argues that Johnson should have been aware that Laurie's complaints were fabricated, Chicago Osteopathic also relies on complaints from others, including two phone calls from answering services and comments from Dr. Schwartz as support for the decision to fire him. Mr. Washington offers only bare denials that these phone calls occurred with no personal knowledge.
 
 
 36
 Mr. Washington also states that pretext is demonstrated by Johnson's alleged derogatory statements. However, assuming, as we must at this stage, that the statements were made, they do not demonstrate pretext. In Rush v. McDonald's Corp., 966 F.2d 1104 (7th Cir.1992), the plaintiff asserted that the defendant's reasons for firing her were pretextual and offered evidence to show that "the two individual defendants were biased against blacks, and that they were looking for an excuse to discharge her." Id. at 1115. She claimed that her immediate supervisor's antipathy toward blacks was evidenced, among other ways, by her statements that blacks complained too much, by the fact that she set up the lunch schedule so that the black employees could not eat together, and by the fact that she would break up conversations among black employees. Id. at 1115-1116. The court concluded that the plaintiff's allegations were not sufficient to meet the burden of showing that the employer's reason for firing her were pretextual because she failed to demonstrate the required nexus between the alleged racially derogatory remarks and the decision to fire her. Id. at 1116-17 ("stray remarks did not prove that inappropriate criteria had been used in making an employment decision, and that a plaintiff still had to show that these criteria were the basis for the employer's decision") (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)); see also Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1265-67 (7th Cir.1993) (plaintiff had not demonstrated that supervisor's comment to plaintiff to "learn to speak English" was evidence of pretext because "plaintiff ... failed to provide the requisite nexus between [the supervisor's] remarks and the hospital's termination decision"); Cf. Beard v. Whitley County REMC, 840 F.2d 405, 410-11 (7th Cir.1988) (allegedly derogatory comments by general manager did not establish direct evidence that defendant had discriminated against women because of their gender).[11]
 
 
 37
 Similarly, here, it does not appear that Mr. Washington has made the requisite demonstration of a connection between the alleged comments by Johnson and the decision to fire him. Even assuming that the derogatory statements were made, the statements generally were not related to Mr. Washington personally. Those statements which were directed at him--"quit trying to talk like you're white" and "get all those dictionaries off your desk and quit acting like you're white"--were unrelated to the decision to fire him. Specifically, Johnson's termination memorandum relied on Washington's failure to "document," "communicate," or "follow-through" on staff and physician coverage, as well as mishandling of two plant and facilities issues.[12] Mr. Washington has not established that Johnson's comments demonstrate that he was fired for inappropriate reasons.
 
 
 38
 Further, although Mr. Washington asserts that Johnson stated that she would make up false information to provide support for his termination, he has failed to show that any statements made by her were, in fact, false. Mr. Washington asserts that Lisa Laurie, one of the clinic managers who complained to Johnson about Mr. Washington, gave false reports about him, but he does not allege that any of the performance criticisms offered by Johnson were manufactured. In fact, Mr. Washington attempts to establish a defense to each of the performance criticisms offered by Johnson. Consequently, he has failed to create a genuine issue of material fact with respect to this issue.
 
 
 39
 Finally, Mr. Washington argues that pretext is established by the fact that Chicago Osteopathic changed its story as to when it decided to promote Jennifer Kramer, a fourth Assistant Administrator who was hired during January 1991. Although in its written response to the IDHR regarding Mr. Washington's charges, Chicago Osteopathic stated that it was not until May 1991 that it decided to promote Kramer from Administrative Assistant to Assistant Administrator, it stated in its motion for summary judgment (and Johnson testified during her deposition) that it began to phase in Kramer in January 1991 for the position. Mr. Washington argues that the statements are inconsistent and thus demonstrate that Chicago Osteopathic had hired his replacement before he was fired. These statements, however, are not necessarily inconsistent. Chicago Osteopathic asserts that they hired Kramer in January to phase her in as a fourth Assistant Administrator, and that she was promoted earlier due to Mr. Washington's termination. It also states that another Assistant Administrator was not hired in the fourth position because of budgetary cutbacks which led, in addition, to the closing of several clinics. Mr. Washington simply has failed to demonstrate that the "step-up" of Kramer's promotion establishes pretext for his termination.
 
 IV. CONCLUSION
 
 40
 Mr. Washington has not demonstrated that a genuine issue of material fact exists as to whether he was performing to expectations or whether similarly situated employees outside his class were treated more favorably. Further, Mr. Washington has not presented sufficient evidence such that a rational finder of fact could reasonably infer that the reasons provided by Chicago Osteopathic for terminating him were pretextual. "We have consistently held that the courts must avoid stepping into the role of super personnel manager and must not second guess legitimate business decisions." Brasic v. Heinemann's, Inc., 1997 WL 426945 (7th Cir. July 30, 1997). While the relationship between Mr. Washington and his supervisor appears to have deteriorated quickly after his initial performance evaluation, personality conflicts alone do not provide a basis for Title VII relief.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 Johnson states that the written evaluation was more detailed than others because she was extending Mr. Washington's probationary period and felt that the additional detail was necessary to support this extension
 
 
 [2]
 Although this statement appears somewhat illogical, Mr. Washington testified that this was the option given to him by Johnson at their January 25, 1991 meeting. R.23, Pl. Answer to Defendant's Statement of Material Fact, p 43 (citing Exh. B at 175-176 of Loose Pleadings, Vol. 2)
 
 
 [3]
 In this memorandum, Johnson stated that Mr. Washington had neither provided a written response to the 90-day evaluation nor scheduled meetings with her twice per week as requested. The memorandum also noted that after a conversation on January 25, 1991, to discuss continued performance problems, he asked for one more week to "prove himself" and stated that if after that week his performance had not improved, he would resign "on a mutually amicable note." R.22, Loose Pleadings, Vol. 1, Exh. A, exh. 11. Mr. Washington testified that he recalled the meeting on January 25, 1991, during which he stated he would not give any of his centers to Jennifer Kramer. He also testified that Johnson stated during this meeting that she would make up whatever she needed in order to terminate him. R.22, Loose Pleadings, Vol. 1, Exh. A at 95. Chicago Osteopathic's counsel asked Mr. Washington if he remembered asking for more time to prove himself, but the full answer has not been provided as the entire depositions are not included in the record on appeal
 
 
 [4]
 The record does not indicate the exact dates of these statements, but Mr. Washington testified during his deposition that Johnson made this comment three or four times during staff meetings with the Assistant Administrators. R.23, Loose Pleadings, Vol. 2, Exh. B at 130-31
 
 
 [5]
 At one point during her deposition, Johnson was asked about the alleged racially derogatory comment made during a tour of one of the clinics; however, the full text of this testimony is not provided in the record on appeal. Loose Pleadings, Vol. 1, Exh. B at 102. Later in the deposition she testified that she was not concerned that the potential client would decline to become a client if it knew of the doctor's race because several employees of the potential client already saw the doctor as their personal physician. Id. at 122
 
 
 [6]
 This court recently stated, however, that "neither Williams nor Yarbrough stand for the blanket proposition that every plaintiff who claims that his or her work performance was satisfactory meets McDonnell Douglas' second element" because "[s]uch an interpretation would effectively render that element of the test meaningless." Oates v. Discovery Zone, 116 F.3d 1161, 1171-72 (7th Cir1997). Rather, the prima facie showing " 'may be based solely on the employee's testimony.' " Id. at 1172 (quoting Williams, 856 F.2d at 923 n. 6)
 
 
 [7]
 Mr. Washington testified during his deposition that a medical assistant at one of the clinics managed by Laurie had approached Washington and complained that Laurie was harassing her. R.23, Exh. B at 113. Washington testified that Laurie later confronted him and told him that he should not have spoken with the employee and Mr. Washington responded that she could not tell him what to do because he was her boss
 
 
 [8]
 In Chicago Osteopathic's Memorandum In support of Summary Judgment and in his Memorandum In Opposition to Defendant's Motion for Summary Judgment, the parties refer to the date as January 18, 1991. However, in their briefs on appeal, both parties refer to the date as January 28, 1991. It appears that the correct date is January 28, 1991. R.22, Exh. B, Dep. exh. 5 at 2
 
 
 [9]
 Alternatively, Johnson's February 11, 1991, "Employment Termination" memo (R.22, Exh. B., Dep. exh. 5 at 2) to Theresa Banaszak, the Human Resources Vice-President for Chicago Osteopathic, recounts that when she asked Washington about the interview, he stated that he had been unable to reach Laurie on Friday evening and had come in the office early to call Laurie at home to notify her of the interview but that she already had left. Johnson stated that when she asked him why he had not called Laurie over the weekend, he stated that he was tired and then forgot
 
 
 [10]
 Mr. Washington's denial of these phone calls is not based on personal knowledge and therefore, does not satisfy the form of affidavits required under Federal Rule of Civil Procedure 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence")
 
 
 [11]
 Although Mr. Washington cites to McNeil v. Economics Laboratory. Inc., 800 F.2d 111, 115-116 (7th Cir.1986), overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834 (7th Cir.1988), in support of his argument that the alleged statements made by Johnson demonstrated an intent to discriminate, McNeil is distinguishable. In McNeil, an age discrimination case, an executive in charge of a reduction-inforce effort sent several memos describing how the company could "eliminate [its] dependence on over-paid and under-motivated veterans of 10 or 15 or 20 years" and describing how it could "make [itself] independent of [its] reliance on old-timers without the right motivation or education and can hire bright young people fresh out of college." Id. at 115 n. 3. Similar comments simply have not been alleged by Mr. Washington nor are the comments that are alleged directly linked to Mr. Washington's termination or performance problems
 
 
 [12]
 Although mentioned in the Defendants' Memorandum In Support of Summary Judgment, see Supplemental Record Exh. C at 5, the plant and facilities problems were not included in the Defendant's Rule 12M Statement of Material Fact, nor were they addressed in the briefs on appeal